## IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

**STEADFAST INSURANCE COMPANY and
ARCH INSURANCE COMPANY**

        **Plaintiffs,**

v.                                **Civil Action No.:_____**

**BERKLEY NATIONAL INSURANCE
COMPANY, HG ENERGY, LLC, a West Virginia
Limited Liability Company, STRIC-LAN
COMPANIES, LLC, a Louisiana Limited
Liability Company, TYLER KUNZ and LACEY
KUNZ, his wife, Individually and as the parents
and next-friends of PARKER KUNZ,**

        **Defendants.**

### DECLARATORY JUDGMENT ACTION OF
### STEADFAST INSURANCE COMPANY
### AND ARCH INSURANCE COMPANY

Pursuant to W.Va. Code § 55-13-1, *et seq.*, Plaintiffs Steadfast Insurance Company ("Steadfast Insurance") and Arch Insurance Company ("Arch Insurance") hereby request a declaration of legal rights and responsibilities owed to HG Energy, LLC ("HG Energy") and other related relief under an Energy Commercial General Liability Policy, Policy Number EGL000177910, and an Energy Commercial Umbrella Liability Policy, Policy Number EUL000178010, that Defendant Berkley National Insurance Company ("Berkley") issued to Defendant Stric-Lan Companies, LLC ("Stric-Lan"). The central question in this declaratory judgment action is whether the Berkley insurance policies at issue provide insurance coverage for HG Energy for the allegations contained in the underlying lawsuit filed by Tyler Kunz, Lacey Kunz, and Parker Kunz, in the Circuit Court of Wood County, West Virginia, Civil Action No. 13-C-337, and whether the Berkley insurance policies at issue provide primary insurance coverage. A copy of the underlying lawsuit is attached to this Complaint as Exhibit "A".

Steadfast Insurance and Arch Insurance hereby allege as follows:



**DEFENDANT'S
EXHIBIT
A**

FILED IN OFFICE

JUN - 1 2015

CAROLE JONES
CLERK CIRCUIT COURT

## I. THE PARTIES

1. Plaintiff Steadfast Insurance is a Delaware corporation engaged in the insurance business with a statutory home office located at 32 Loockerman Square, Dover, Delaware 19904, and its principal place of business located at 1400 American Lane, Schaumburg, Illinois 60196. Steadfast operates as a qualified surplus lines insurer in West Virginia.

2. Plaintiff Arch Insurance is a foreign corporation licensed to do business in West Virginia.

3. Upon information and belief, Defendant Berkley National Insurance Company is a foreign corporation licensed to do business in West Virginia.

4. Defendant HG Energy is a West Virginia limited liability company with its principal place of business in Wood County, West Virginia.

5. Upon information and belief, Defendant Stric-Lan is a Louisiana limited liability company with its principal place of business in Louisiana.

6. Upon information and belief, Defendants Tyler Kunz, Lacey Kunz, and Parker Kunz ("Kunz") are residents of Texas.

## II. JURISDICTION AND VENUE

7. This Court has authority to grant declaratory judgment pursuant to W.Va. Code § 55-13-1, *et seq.*, because Steadfast Insurance, Arch Insurance, Berkley, HG Energy, and Stric-Lan are engaged in an actual controversy susceptible to specific relief over the application of provisions in the Berkley insurance policies and any potential ensuing duties. This controversy is within the jurisdiction of the Court.

8. Venue is proper in Wood County, West Virginia, pursuant to W.Va. Code §§ 55-13-1 and 56-1-1, because Defendant HG Energy has its principal office located in Wood County, West Virginia.

2

## III. THE UNDERLYING COMPLAINT

9. The underlying lawsuit arises out of an incident in which Tyler Kunz injured himself while working as an employee of Stric-Lan. On or about July 31, 2013, Tyler Kunz was working at the LS Hoyt 401 Pad, located in Wetzel County, West Virginia which is allegedly owned by HG Energy. While being located in close proximity to an open gas tank, Tyler Kunz lit a cigarette which resulted in a horrific explosion in which he allegedly sustained burn injuries. Accordingly, Tyler Kunz filed the underlying lawsuit against Stric-Lan and HG Energy.

10. In *Tyler Kunz, et al. v. HG Energy, LLC, et al.* (Circuit Court of Wood County, West Virginia, Civil Action No. 13-C-337) ("The Underlying Complaint"), Kunz has alleged three causes of action arising from injuries he allegedly sustained while working for Stric-Lan, two of which seek recovery from HG Energy. Those causes of action are:

Count I    Negligence

Count III    Loss of Parental and Spousal Support and Consortium

11. HG Energy is being defended in The Underlying Complaint by Steadfast Insurance Company, which issued a Commercial General Liability insurance policy to HG Energy as the Named Insured, Policy Number GL05501029-03 ("The Steadfast Policy").

## IV. HG ENERGY AND STRIC-LAN'S BUSINESS RELATIONSHIP

12. Defendant HG Energy and Defendant Stric-Lan entered into a Master Service and Supply Agreement ("MSA") on or about October 1, 2012, wherein Stric-Lan agreed to provide certain services for HG Energy related to the exploration for, development or production of, oil, natural gas, sulfur or other minerals. See, Master Service and Supply Agreement, attached as Exhibit "B".

13. Among other things, the MSA required Stric-Lan to purchase general liability insurance in the amount of $1,000,000.00. However, the MSA provided that Stric-Lan agreed that

3

"the insurance obligations . . . shall not in any way limit the defense and indemnity obligations" and that **"all insurance policies** of Contractor [Stric-Lan], **whether or not required by this Agreement,** shall, to the extent applicable to the performing of services and/or providing of goods, equipment or facilities by Contractor [Stric-Lan]: (1) name [HG Energy] as an additional insured . . . (2) waive all rights of subrogation against [HG Energy] and its insurers . . . and (3) be primary in relation to any policies in which any member of [HG Energy] is a named or additional insured." Exhibit "B", p. 6, ¶ A.1., and p. 7, ¶ 2 (emphasis added).

14.     Thus, as the MSA required Stric-Lan to add HG Energy as an additional insured to "all insurance policies," the amount of coverage extends to the $19,000,000.00 of umbrella/excess insurance purchased by Stric-Lan.

15.     In order to fulfill its obligation to obtain insurance coverage as set forth in Paragraph 13 above, Stric-Lan purchased an Energy Commercial General Liability Policy from Berkley, Policy Number EGL000177910, with effective dates of October 1, 2012 through October 1, 2013 ("Berkley CGL Policy"). See, Berkley CGL Policy, attached as Exhibit "C".

16.     In addition to purchasing the Berkley CGL Policy, Stric-Lan also purchased an Energy Commercial Umbrella Liability Policy from Berkley, Policy Number EUL000178010, with effective dates of October 1, 2012 through October 1, 2013 ("Berkley Excess Policy"). See, Berkley Excess Policy, attached as Exhibit "D".

17.     Both the Berkley CGL Policy, and the Berkley Excess Policy, were listed on the Certificate of Liability Insurance that was issued to Stric-Lan, and which clearly identifies HG Energy as a CERTIFICATE HOLDER. See, Certificate of Insurance, attached as Exhibit "E".

18.     The MSA further provides that Stric-Lan agreed to defend and indemnify HG Energy against claims brought or asserted against HG Energy to the extent such claims, losses,

4

damages and/or injuries were caused by the negligence, strict liability, or willful misconduct of Stric-Lan. See, Exhibit "B", pp. 8-10, 12-13.

19. As a result, Stric-Lan has a duty to defend and indemnify HG Energy against the claims brought by Kunz in The Underlying Complaint.

20. In accordance with the terms of the MSA, HG Energy properly tendered the defense and indemnification of The Underlying Complaint to Stric-Lan by letter dated January 23, 2014. See, January 23, 2014, letter, attached as Exhibit "F".

21. On February 13, 2014, counsel for Stric-Lan sent a letter to counsel for HG Energy declining HG Energy's request for defense and indemnification under the MSA, because, according to Stric-Lan, "none of the three triggers [negligence (of any degree), strict liability, or willful misconduct of Stric-Lan] for indemnification under the Master Service Agreement have been alleged" as the only claim against Stric-Lan in the Underlying Complaint was a statutory deliberate intent claim. See, February 13, 2014, letter, attached as Exhibit "G".

22. Stric-Lan's denial of a defense and indemnification was improper because according to the MSA, Stric-Lan agreed to "defend, indemnify, hold harmless, and release [HG Energy] from and against any and all claims ... brought or asserted against [HG Energy] ... arising out of or related to [the MSA] ... to the extent that such claims, losses, damages, injuries, illnesses, or death are caused by the negligence (of any degree), strict liability, or willful misconduct of [Stric-Lan], regardless of whether [HG Energy] is negligent in part."

23. Because Tyler Kunz's injuries allegedly resulted from Stric-Lan's work for HG Energy the claims against HG Energy in the Underlying Complaint arose out of the MSA, and were caused by the conduct of Stric-Lan.

24. Thus, Stric-Lan owes HG Energy a defense and indemnification under the MSA.

5

## V. THE STEADFAST INSURANCE POLICY

25.     Plaintiff Steadfast Insurance issued a Commercial General Liability insurance policy bearing Policy Number GL05501029-03 ("The Steadfast Policy") to HG Energy as the Named Insured.

26.     Pursuant to the terms of the MSA, the Berkley CGL Policy and the Berkley Excess Policy should provide primary, non-contributory insurance coverage to HG Energy as an additional insured. Therefore, insurance coverage under The Steadfast Policy should not be triggered, and Berkley should have assumed HG Energy's defense against the claims brought by Kunz in The Underlying Complaint.

## VI. THE ARCH INSURANCE POLICY

27.     Plaintiff Arch Insurance issued a Commercial Umbrella Liability Insurance Policy, Policy Number ULP005353600, ("The Arch Policy") to HG Energy, which provides umbrella/excess insurance coverage to HG Energy over the Steadfast Policy.

28.     Pursuant to the terms of the MSA, the Berkley CGL Policy and the Berkley Excess Policy should provide primary, non-contributory insurance coverage to HG Energy as an additional insured. Therefore, insurance coverage under The Arch Policy should not be triggered.

## VII. THE BERKLEY CGL POLICY

29.     Among other things, the insuring agreement of the Berkley CGL Policy provides, in relevant part, as follows:

### II. COVERAGES AND DUTY TO DEFEND

#### A. Bodily Injury and Property Damage Liability

WE will pay the amounts that an INSURED becomes legally obligated to pay as damages because of BODILY INJURY or PROPERTY DAMAGE caused by an OCCURRENCE for which this policy applies.

6

30.    The Berkley CGL Policy defines "insured", "bodily injury", and "occurrence" as

follows:

### IX.    DEFINITIONS

**BODILY INJURY** means physical injury, sickness, or disease sustained by a person, including death, resulting from any of these at any time.    **BODILY INJURY** includes mental anguish or other mental injury to that person sustaining physical injury.

**INSURED** means a person or organization qualifying as an **INSURED** in Section I. Named Insureds And Insureds.

**OCCURRENCE** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

31.    Section I. NAMED INSUREDS AND INSUREDS of the Berkley CGL Policy

provides the following explanation of who qualifies as an INSURED:

### B.    Insureds

Each of the following is an **INSURED** with respect to the coverages set forth in Section II.A. Bodily Injury and Property Damage Liability, Section II.C. Personal and Advertising Injury Liability, and Section II.D. Medical Payments of this policy:

#### 1.    Additional Insured:

Any person or organization with whom **YOU** agree in writing in a contract or agreement, to add as an Additional Insured on **YOUR** policy or to provide liability insurance for, but only with respect to liability arising out of **YOUR** operations, or liability arising out of premises owned by or rented to **YOU**.

In addition, the written contract or written agreement requiring **YOU** to include a person or organization as an Additional Insured must be in effect during the policy period and executed before the **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL AND ADVERTISING INJURY** occurred.    Furthermore, the insurance provided will not exceed the lessor of:

a.    The coverage and/or limits of this policy; or

b.    The coverage and/or limits required by said contract or agreement.

7

32.     HG Energy clearly qualifies as an INSURED under the Berkley CGL Policy issued

to Stric-Lan, as Stric-Lan agreed in the MSA to add HG Energy as an Additional Insured to its

insurance policies, which was in effect during the policy period and executed prior to the Kunz

injury. Furthermore, the Certificate of Insurance issued to Stric-Lan, which lists the Berkley CGL

Policy, clearly identified HG Energy as a Certificate Holder.

33.     Thus, because HG Energy is an insured under the Berkley CGL Policy, Berkley

owes HG Energy a duty to defend and indemnify it against the claims made by Kunz in The

Underlying Complaint up to and including the limits of liability contained in the Berkley CGL

Policy.

## VIII.  THE BERKLEY EXCESS POLICY

34.     The Berkley Excess Policy provides the following relevant insuring agreement:

## I.     COVERAGES

### A.     Coverage A – Excess Follow Form Liability Insurance

Subject to all of the terms and conditions applicable to Coverage A - Excess
Follow Form Liability Insurance, WE will pay on behalf of the INSURED,
those damages or POLLUTION CLEAN UP COSTS covered by this policy
in excess of the total applicable limits of UNDERLYING INSURANCE.
With respect to Coverage A, the terms and conditions of UNDERLYING
INSURANCE are made a part of this policy, except with respect to:

1.     Any contrary provision contained in this policy; or

2.     Any provision in this policy for which a similar provisions is not
       contained in UNDERLYING INSURANCE.

With respect to the exceptions stated above, nothing contained therein will
serve to make this policy broader than the UNDERLYING INSURANCE.

35.     The Berkley Excess Policy defines "Insured" and "Underlying Insurance" as

follows:

## IX.    DEFINITIONS

INSURED means:

8

> **a.** For Coverage A – Excess Follow Form Liability Insurance, a person of organization qualifying as an **INSURED** in Section III.A.2. of this policy.

**UNDERLYING INSURANCE** means the policy or policies of insurance listed in the Schedule of **UNDERLYING INSURANCE** forming a part of this policy.

36. Section III.A.2. of the Berkley Excess Policy provides that the following entities qualify as Insureds:

### III. NAMED INSUREDS AND INSUREDS

#### A. Coverage A – Excess Follow Form Liability Insurance

With respect to Coverage A – Excess Follow Form Liability Insurance, the following persons and organizations qualify as **INSUREDS**:

\* \* \*

**2.** Other persons or organizations qualifying as an **INSURED** in **UNDERLYING INSURANCE**, but not beyond any limitation imposed under any contract or agreement.

37. The Schedule of Underlying Insurance in the Berkley Excess Policy clearly identifies the Berkley CGL Policy as Underlying Insurance.

38. HG Energy clearly qualifies as an INSURED under the Berkley Excess Policy because HG Energy is an insured under the Berkley CGL Policy, which is UNDERLYING INSURANCE for purposes of triggering the Berkley Excess Policy. Additionally, as set forth in Paragraph 14 above, the Berkley Excess Policy was listed on the Certificate of Insurance issued to Stric-Lan, which clearly identified HG Energy as a Certificate Holder.

39. Therefore, because HG Energy is an insured under the Berkley Excess Policy, Berkley owes HG Energy a duty to indemnify it against the claims made by Kunz in The Underlying Complaint, excess of the Berkley GL Policy and up to and including the limits of liability provided in the Berkley Excess Policy.

9

## IX. THE PROPER TIME TO DETERMINE INSURANCE COVERAGE

40. This is the proper time to have this coverage determination made because the trial of this matter is scheduled to begin on June 22, 2015.

41. As stated in Christian v Sizemore, 383 S.E.2d 810, 814 (W.Va. 1989), "[d]eclaratory judgment . . . provides a prompt means of resolving policy coverage disputes so that the parties may know in advance of the personal injury trial whether coverage exists. This facilitates the possibility of settlements and avoids potential future litigation . . ."

42. The Supreme Court of Appeals of West Virginia also stated that where, as here, "the coverage question is separable from the issues in the underlying tort action, it should ordinarily be decided first . . ."

43. Thus, the Court should stay the Underlying Complaint pending the resolution of this Declaratory Judgment Action in order to help facilitate potential settlement once the insurance coverage question is resolved, and potentially eliminate additional litigation.

## X. STATEMENT OF PRECISE RELIEF SOUGHT

44. Plaintiffs Steadfast Insurance and Arch Insurance hereby seek a declaration from this Court that the Berkley CGL Policy and the Berkley Excess Policy provide insurance coverage to Defendant HG Energy as an additional insured for the claims set forth in The Underlying Complaint. In addition, Plaintiffs Steadfast Insurance and Arch Insurance seek a declaration from this Court that the Berkley CGL Policy and the Berkley Excess Policy provide primary, non-contributory coverage for the claims set forth in The Underlying Complaint in accordance with the terms of the MSA entered into between Defendant HG Energy and Defendant Stric-Lan.

45. Plaintiff Steadfast Insurance seeks relief in the form of a judgment in its favor and against Berkley for all defense costs and expenses Steadfast Insurance has incurred in the defense of HG Energy in the Underlying Complaint, together with interest on those sums, and an Order

declaring that Berkley has a primary and non-contributing duty to defend HG Energy in that

Underlying Complaint.

Respectfully submitted,

**STEADFAST INSURANCE COMPANY and
ARCH INSURANCE COMPANY**

**BY: SPILMAN THOMAS & BATTLE, PLLC**

Don C.A. Parker (WV State Bar #7766)
Laura E. Hayes (WV State Bar #7345)
Andrew S. Dornbos (WV State Bar #11124)
P.O. Box 273
Charleston, WV 25321-0273
(304) 340-3800
(304) 340-3801 – facsimile
*Attorney(s) for plaintiffs*
*Steadfast Insurance Company and*
*Arch Insurance Company*

11

# EXHIBIT A

FILED IN OFFICE

JUN – 1 2015

CAROLE JONES
CLERK CIRCUIT COURT

IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

TYLER KUNZ, and LACEY KUNZ, his wife,
Individually and as the parents and next-friends of
PARKER KUNZ,
Infant under the age of 18 years,

        Plaintiffs,

v.

                                    Civil Action No.: *13·C· 337*
                                    Judge: _____

HG ENERGY, LLC
a West Virginia Limited Liability Company;
STRIC-LAN COMPANIES, LLC,
a Louisiana Limited Liability Company.

        Defendants.

## COMPLAINT

NOW COME Tyler Kunz and Lacey Kunz, hereinafter Plaintiffs, by and through undersigned counsel, and for their Complaint against defendants HG Energy, LLC, and Stric-Lan Companies, LLC, state and allege the following:

## PARTIES

1.     Plaintiffs, Tyler Kunz and Lacey Kunz are residents of Comal County, Texas.

2.     Defendant, HG Energy, LLC, is and was, at all times relevant to the events underlying this Complaint, a Limited Liability Company incorporated in West Virginia with its principal place of business in Wood County, West Virginia.

1

FILED IN OFFICE

AUG 3 0 2013

CAROLE JONES
CLERK CIRCUIT COURT

3.     Defendant, Stric-Lan Companies, LLC, is and was, at all times relevant to the events underlying this Complaint, a Limited Liability Company incorporated in Louisiana with its principal place of business in Duson, Lafayette Parish, Louisiana.

## VENUE

4.     Venue is proper in Wood County, West Virginia, pursuant to W. Va. Code § 56-1-1, because Defendant HG Energy, LLC, has its principal office located there.

## FACTS

5.     At all relevant times herein, the Plaintiff, Tyler Kunz was an employee of Stric-Lan Companies LLC, an oilfield service company, working at a location owned, operated, and controlled by the Defendant, HG Energy, LLC, and working within the scope of said employment.

6.     On or about July 31, 2013, Plaintiff Tyler Kunz was working at the LS Hoyt 401 Pad, located in Wetzel County, West Virginia, owned, operated and controlled by HG Energy, LLC.

7.     At or about 12:47 a.m. an explosion occurred at said worksite causing severe burns and catastrophic injuries to Tyler Kunz.

## COUNT I

## NEGLIGENCE

8.     The Plaintiff hereby incorporates by reference the preceding paragraphs, as if set forth verbatim hereinafter.

9.     At all relevant times herein, Defendant HG Energy, LLC, owed a duty of reasonable care and duty to provide a reasonably safe workplace to invitee workmen, including Plaintiff Tyler Kunz, at the aforesaid worksite. Furthermore, at all relevant times herein,

2

Defendant HG Energy, LLC, voluntarily assumed and undertook to provide safety services, for the purpose of conferring safety benefits to individual workers, including Plaintiff Tyler Kunz, at said worksite.

10. Defendant HG Energy, LLC negligently and/or recklessly failed to exercise reasonable care with respect to the safety of invitee workmen, including Plaintiff Tyler Kunz, and with respect to its aforesaid voluntary undertaking.

11. As a direct and proximate result of Defendant HG Energy, LLC's actions and/or failures to act, as aforesaid, Plaintiff Tyler Kunz suffered catastrophic injury, including suffering, permanent injuries, loss of wages, loss of capacity to earn, loss of enjoyment of life, pain and suffering, mental anguish, and disfigurement, and said Plaintiff has and in the future will be in need of medical care and hospital treatment.

## COUNT II

## STATUTORY DELIBERATE INTENT – STRIC-LAN COMPANIES, LLC

12. The Plaintiff hereby incorporates by reference the preceding paragraphs, as if set forth verbatim hereinafter.

13. Plaintiff Tyler Kunz was catastrophically injured as a direct and proximate result of the actions and/or failures to act of Defendant Stric-Lan Companies, LLC, which actions and/or failures to act constitute acts of "deliberate intention" as that term is defined in West Virginia Code § 23-4-2(c)(2)(ii), as last amended, in that:

(a) At all times relevant herein, Defendant Stric-Lan Companies, LLC, created a specific unsafe working condition, which presented a high degree of risk and strong probability of serious injury to the Plaintiff.

3

(b)     Defendant Stric-Lan Companies, LLC, had actual knowledge of the existence of the aforesaid specific unsafe working condition and an appreciation of the high degree of risk and the strong probability of serious injury presented by such specific unsafe working condition.

(c)     That aforesaid specific unsafe working conditions was in violation of the federal and state statutes, rules or regulations, whether cited or not, or of commonly accepted and well-known industry safety standards, as well as rules and regulations governing the safety of those employed in underground mines.

(d)     That Defendant Stric-Lan Companies, LLC, acting through its foremen and supervisors, nevertheless exposed the Plaintiff to such specific unsafe working condition intentionally.

(e)     As a direct and proximate result of the aforesaid specific unsafe working condition, Plaintiff suffered a severe compensable injury, including suffering permanent injuries, loss of wages, loss of capacity to earn, loss of enjoyment of life, pain and suffering, mental anguish, and disfigurement. As a further direct and proximate result of the aforesaid unsafe working condition, Plaintiff has and in the future will be in need of medical care and hospital treatment.

## COUNT III

## LOSS OF PARENTAL AND SPOUSAL SUPPORT AND CONSORTIUM

14.     The Plaintiff hereby incorporates by reference the preceding paragraphs, as if set forth verbatim hereinafter.

4

15.    Prior to, and at the time of, the accident made the basis of this suit, Plaintiffs, Tyler Kunz and Lacey Kunz, were husband and wife, and enjoyed a fulfilling and happy marriage relationship.

16.    As a direct and proximate result of the negligence of the Defendant, and the consequent injuries suffered by her husband Tyler Kunz, Plaintiff Lacey Kunz, has suffered a substantial loss of consortium, and has suffered a substantial impairment of the affection, solace, comfort, companionship, society, assistance and sexual relations necessary to a successful marriage. Plaintiff, Lacey Kunz, has suffered grief and mental anguish, loss of contributions, both by way of money and advise, labor, services, and counsel and has been damaged as a result thereof.

17.    As a direct and proximate result of the aforesaid conduct of the Defendants, and each of them, the infant Parker Kunz has suffered the loss of parental consortium with his father, Tyler Kunz, including the loss of his affection, loss of his care, income and other services, loss of his other duties, obligations, and responsibilities as a father.

## DAMAGES

18.    The Plaintiff hereby incorporates by reference the preceding paragraphs, as if set forth verbatim hereinafter.

19.    Plaintiffs demand judgment against the Defendants, and each of them, jointly and/or severally, in an amount sufficient to compensate them for their damages, pre-judgment and post-judgment interest, costs, and attorneys fees permitted by law and any other relief that the Court may deem just.

20.    The Plaintiffs also demands punitive damages from all defendants, except for those claims arising under W.Va. Code § 23-4-2(c)(2)(ii).

5

21.    The Plaintiffs demand judgment against the defendant for their loss of consortium

as aforesaid, and any other relief that the Court may deem just.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury upon all issues triable by a jury raised herein.

TYLER KUNZ, and LACEY KUNZ, his wife

Plaintiffs, By Counsel:

W. Stuart Calwell, Jr. (W. Va. Bar No. 0595)
David H. Carriger (W. Va. Bar No. 7140)
Benjamin D. Adams (W. Va. Bar No. 11454)
THE CALWELL PRACTICE, PLLC
Law and Arts Center West
500 Randolph Street
Charleston, West Virginia 25302
304.343.4323
304.344.3684 Facsimile

and

Jim Cole (TX Bar No. 04538500)
COLE, COLE & EASLEY, P.C.
302 West Forrest Street
Victoria, Texas 77901
361.575.0551
361.575.0986 Facsimile

6

# EXHIBIT B

## MASTER SERVICE AND SUPPLY AGREEMENT

THIS MASTER SERVICE AND SUPPLY AGREEMENT (referred to as "this Agreement"), made and entered into this 1st day of October, 2012, by and between the Parties designated in this Agreement as "Company" and "Contractor" (who may be referred to collectively in this Agreement as "the Parties").

COMPANY: HG Energy, LLC, a West Virginia LLC

ADDRESS: 2200 Georgetowne Drive, Suite 501
Sewickley, PA 15143

TELEPHONE: (724) 935-8959

CONTRACT
ADMINISTRATOR: Vicki Dibish

EMAIL
ADDRESS: vdibish@hgenergyllc.com

CONTRACTOR: Stric-Lan Companies LLC

ADDRESS: PO Box 62288
Lafayette, LA 70596-2288

TELEPHONE: 800-749-4586

CONTRACT Nick DeCecco
ADMINISTRATOR:

EMAIL NickD@striclan.com
ADDRESS:

FEIN OR SOCIAL
SECURITY NO.:

1

I.  EMPLOYMENT OF CONTRACTOR - PURCHASE OF GOODS

A.     In connection with the construction and/or operation of properties
and facilities for the exploration for, or the development or production of,
oil, natural gas, sulfur or other minerals in the United States, and/or any
other activity or material related to the business of Company, Company
shall:

(1) Employ or procure the services of Contractor from time to time,
and/or;

(2) Purchase and/or lease goods, equipment or facilities from
Contractor.

The services and/or goods to be supplied, purchased, and/or
leased are set forth in Exhibit "A" or on any addendum, purchase order,
work order, or any other document prepared to describe services and/or
goods to be supplied. Any such Exhibit "A" or addendum, purchase order,
work order, or any other document prepared to describe services and/or
material, equipment, or goods to be supplied is/are incorporated into this
Agreement by reference and, to the extent that any of the language,
terms, or conditions of the incorporated document(s) are inconsistent with
this Agreement, this Agreement shall take precedence and control.

B.     Contractor represents that it has adequate equipment in good
working order and fully trained personnel capable of safely operating such
equipment and performing the services described in this Agreement . The
Parties agree that the services to be performed by Contractor and the
material, equipment, or goods to be provided by Contractor may be under
oral or written work orders or purchase orders given by Company to
Contractor from time to time during the term of this Agreement.

2

C.      When notified by Company either orally or by written work order, of the work desired, Contractor shall commence furnishing same at the agreed upon time, and continue such operations diligently and without delay, in strict conformance with this Agreement.

D.      Relative to any work for Company, Contractor shall not employ any person whose employment violates any labor, employment or other applicable laws.

E.      All work rendered or performed by Contractor shall be done with due diligence, in a good and workmanlike manner, using skilled, competent and experienced workmen and supervisors and in accordance with good oilfield servicing practices and/or the standards that pertain to Contractor's industry, trade, or profession. All materials, equipment, supplies or manufactured articles furnished by Contractor in the performance of the work or necessary for the construction or completion of the work shall be selected and used with good oilfield practice for their respective purposes and shall be free from defects. Any portion of the work found defective or unsuitable shall be removed, replaced, or corrected by Contractor without additional cost or risk to Company.

F.      Contractor agrees to inspect all materials and equipment furnished by Company directly employed in the course of operations conducted hereunder and shall notify Company of any apparent defects therein before using such materials and equipment. Should Contractor use such materials and equipment without notifying Company of any defect, except latent defects that a reasonable inspection would not have revealed, Contractor shall be deemed to have assumed all risk and liability for any mishap that may occur in operations conducted hereunder by reason of failure or defects in such materials and equipment.

3

G.  Contractor agrees to maintain its equipment in good operating condition at all times and shall use all reasonable means to control and prevent fires and (to the extent applicable to its work) blowouts, protect the hole and to protect Company's personnel, property, and equipment.

## II.  INDEPENDENT CONTRACTOR

A.  Contractor shall be and is an independent contractor. Company is interested only in the results obtained and has only the general right of inspection and supervision in order to secure the satisfactory completion of any such services. Company shall not have the right to control or direct the details of the services performed by Contractor. Under no circumstances shall an employee of Contractor be deemed an agent or employee or "borrowed servant" of Company. Contractor warrants that it shall perform its services in a safe, competent and workmanlike manner, in strict conformity with Company's specifications and requirements and in compliance with all applicable statutes, rules, regulations and principles of law. Contractor shall furnish at its own expense and risk all labor, material, equipment, tools, transportation and other items necessary for the safe performance of the requested services, except such of said items as Company agrees in writing to furnish.

## III.  PAYMENT - RIGHT TO WITHHOLD AND REQUIRE PAYMENT OF LIEN CLAIMANTS

A.  Company shall pay Contractor at Contractor's then current rate schedule or as otherwise agreed to by Company and Contractor. Within forty-five (45) days after the acceptance by Company of Contractor's invoice as fully complying with all specifications and requirements of this Agreement, Exhibit "A" attached, and any addendum or work orders, Company shall pay Contractor, as provided below, for (i) services performed or (ii) material, equipment, or goods delivered.

4

B. Contractor shall maintain a complete and correct set of records pertaining to all aspects of this Agreement. Company shall have the right, at Company's sole expense, to inspect and audit any and all such records within a period of two (2) years after the termination of the services performed under this Agreement; provided, however, that Contractor has the right to exclude any trade secrets, formulae or processes from such inspection and audit. Notwithstanding the approval for payment of any invoice submitted, Company shall have the right to withhold any payments until Contractor has furnished (i) verification of performance of services in a manner satisfactory to Company; (ii) verification of performance of all goods, equipment and facilities to which such payment relates in a manner satisfactory to Company; (iii) proof that all claims against Contractor by Contractor's suppliers, contractors and subcontractors (regardless of whether such contracting or subcontracting is in violation of Article VIII of this Agreement) for labor, material, equipment, or goods of any kind furnished in connection with Contractor's obligations under this Agreement have been fully paid and satisfied; and (iv) proof that all liens and privileges of Contractor's suppliers, contractors and subcontractors (regardless of whether such contracting or subcontracting is in violation of Article VIII of this Agreement) arising out of services performed or goods, equipment or facilities furnished in connection with Contractor's obligations under this Agreement have been fully released.

C.     It is agreed that payment by Company of any invoice shall not constitute a waiver of Company's right subsequently to contest the amount or correctness of any invoice and to seek reimbursement. In the event of any dispute, Company may withhold payment of the disputed amount or Company may pay the disputed amount without waiver of any of its rights, including the right to seek reimbursement. Contractor agrees to not encumber or allow its contractors to encumber Company's property.

5

IV.   INSURANCE

   A.   Introduction

      1.   Relationship Between Insurance and Indemnity Obligations: The Parties agree that the indemnity and insurance obligations contained in this Agreement are separate and apart from each other, such that failure to fulfill the indemnity obligations does not alter or eliminate the insurance obligations or vice versa. The Parties further agree that the insurance obligations in this Article IV shall not in any way limit the defense and indemnity obligations set forth in this Agreement.

   B.   Definitions

For the purposes of Articles IV and V of this Agreement, the following definitions shall apply:

1.   "Contractor" shall mean Contractor, any parent company of Contractor, Contractor's heirs (if applicable), successors and assigns, its subsidiaries and affiliates, all contractors and subcontractors (of every tier) of Contractor, and Contractor's agents, directors, officers and employees.

2.   "Company" shall mean "Company," any parent company of Company, Company's successors and assigns, its subsidiaries and affiliates, and Company's agents, directors, officers, and employees.

   C.   Insurance

1.   Contractor shall secure and maintain at its own cost and expense, except as otherwise provided in this Agreement, policies with the minimum limits and other requirements stated in Exhibit "B," which is attached to and incorporated into this Agreement. All such policies shall

6

be issued by insurance companies that are solvent and satisfactory to
Company, and that have an A.M. Best Rating of "A-" or higher.

2.  Contractor agrees that, as respects risks and liabilities
assumed by Contractor, all insurance policies of Contractor, whether or
not required by this Agreement, shall, to the extent applicable to the
performing of services and/or providing of goods, equipment or facilities by
Contractor: (1) name Company, as defined in this Article IV, as an
additional insured (except for workers compensation coverage); (2) waive
all rights of subrogation against Company and its insurers (whether by
loan receipt, equitable assignment or otherwise); and (3) be primary in
relation to any policies in which any member of the Company is a named
or additional insured.

3.  Contractor agrees that Company shall have the option, on
behalf of Company as defined herein, to pay the premium for the
extension of Contractor's insurance to cover Company as set forth above,
should such an extension be necessary. Upon written notification by
Company of its exercise of this option, Contractor agrees that its insurers
(or their agent or representative) will invoice Company for the premium
amount for such extension of coverage in favor of Company. At each
subsequent renewal of Contractor's insurance, Contractor will advise
Company (on substantially the same form) of the amount of the premium
required for such extension(s) and arrange to have Company invoiced for
the appropriate premium by Contractor's insurers (or their agent or
representative). Contractor warrants that such premium constitutes all
material cost for such extension of coverage in favor of Company.

4.  The Parties agree that Contractor is not required to obtain
coverage protecting Company for those risks specifically allocated to
Company under this Agreement.

7

5.     Prior to performing services and/or providing material, equipment, or goods for Company, Contractor shall furnish Company with Certificates of Insurance reflecting minimum insurance coverage in accordance with the requirements of Exhibit "B." Failure of Contractor to object to Contractor's failure to furnish such certificates or to object to any defect in such certificates shall not be deemed a waiver of Contractor's obligation to furnish such a certificate and to provide minimum insurance coverage as required by this Agreement and Exhibit "B." In addition, Contractor agrees to promptly notify Company in the event that the per occurrence or aggregate limits that apply to any particular coverage required by this Agreement are exhausted.

6.     In the event that Contractor fails to perform any of its obligations with respect to Insurance, with or without the knowledge or consent of Company, then Contractor shall itself be deemed an insurer to the extent it has failed to perform such obligations.

## V.   INDEMNITY – DEFENSE

### A. INTRODUCTION

1.     Purpose: The Parties recognize that in connection with the services, operations, and the provision of material, equipment, or goods contemplated by this Agreement, there is some risk that accidents and events may occur in which property is lost, damaged, or destroyed and/or in which persons may be unfortunately killed or injured. The Parties desire to allocate these risks between them and to require that these risks be adequately insured so as to minimize the possibility of disputes and to engage in effective risk management. For these reasons, the Parties agree to the indemnity and defense obligations set forth below.

8

B. ALLOCATION OF RISK

    1.    CONTRACTOR'S INDEMNITY OBLIGATIONS

Contractor shall defend, indemnify, hold harmless, and release Company from and against any and all claims, losses, damages, demands, causes of action, suits, judgments and liabilities of every kind (including all expenses of litigation, court costs and reasonable attorneys' fees) brought or asserted against Company by any party whomsoever, directly or indirectly arising out of or related to this Agreement and resulting from any claim of loss, damage, injury, illness, or death, including, but not limited to, those described in subparagraphs (a) through (i) below, to the extent that such claims, losses, damages, injuries, illnesses, or death are caused by the negligence (of any degree), strict liability, or willful misconduct of the Contractor, regardless of whether the Company is negligent in part.

    (a)    Personal injury to, bodily injury to, emotional or psychological injury to, property or wage loss, benefits loss, or illness or death of Contractor's employees or invitees, (including, without limitation, all costs and expenses associated with medical evacuation of and/or emergency medical services provided to such persons), even though one or more members of Contractor may be protected from direct suit by state workers' compensation laws.

    (b)    Damage to or loss of any property owned, leased, or provided by Contractor;

    (c)    Liabilities, assessments, costs, expenses, penalties and/or fines arising from or caused by any pollution or any spills or releases of pollutants and/or contaminants from any property, equipment,

or vehicles owned, leased or provided by Contractor, including costs of cleanup of same;

(d)     Consequential damages (including but not limited to lost profits, lost business opportunities, damages for failure to meet deadlines and/or loss of use of equipment) sustained by Contractor;

(e)     Taxes, fines, penalties and other assessments made against Contractor's property or arising out of Contractor's operations;

(f)     Any loss or claim arising out of or related to infringement of or inducement to infringe any patent, license, copyright, trade secret and/or other intellectual property used or provided by Contractor either in performing services under this Agreement or in furnishing or supplying the materials, plans, processes, compositions, or equipment made or used by Contractor pursuant to this Agreement;

(g)     Liens asserted against Company property by Contractor or any of their suppliers;

(h)     Any claim for damages, discrimination, harassment or loss by personnel furnished by Contractor or any of their suppliers, arising out of or in connection with any work performed or to be performed by Contractor pursuant to this Agreement, as well as any such claims arising out of or in connection with the presence of personnel furnished by Contractor or any of its subcontractors, suppliers, or materialmen; and,

(i)     Any breach of this Agreement by Contractor.

10

2.    COMPANY'S INDEMNITY OBLIGATIONS

Company shall defend, indemnify, hold harmless, and release Contractor from and against any and all claims, losses, damages, demands, causes of action, suits, judgments and liabilities of every kind (including all expenses of litigation, court costs and reasonable attorneys' fees) brought or asserted against Contractor by any party whomsoever, directly or indirectly arising out of or related to this Agreement and resulting from any claim of loss, damage, injury, illness, or death, to the extent that such claims, losses, damages, injuries, illnesses, or death are caused by the negligence (of any degree), strict liability, or willful misconduct of Company, regardless of whether the Contractor is negligent in part.

C.    Indemnity-Related Obligations

1.    Without relieving Contractor of any of its indemnity obligations, Company may take part in any degree it deems necessary in the control and removal of any pollution, contamination, or releases or spills of pollutants and/or contaminants, which is the responsibility of Contractor under the foregoing provisions. Contractor shall reimburse Company for all these costs to the extent that such risk is allocated to Contractor by this Agreement.

2.    Contractor agrees that its indemnity obligations will be supported by liability insurance with minimum limits of not less than those indicated on Exhibit "B". Such insurance shall support but shall not limit Contractor's indemnity obligations except to the extent mandated by applicable law.

3.    Should Contractor have occasion to be upon or about or using Company's equipment or premises performing services and/or

11

providing goods, equipment or facilities for another company, and/or should Contractor be in transit to or from a Company location, then the provisions of Articles IV and V shall apply as if Contractor were performing services and/or providing goods, equipment or facilities for Company.

D.    Defense Obligations

1.    Regardless of the enforceability of any of the above indemnity obligations, the Contractor shall owe Company a separate duty to investigate, handle, respond to and provide defense for any claim, demand or suit for which Contractor extends indemnity in this Agreement, and shall satisfy any and all judgments or decrees which may be entered. .

2.    The duty of defense shall require Contractor to retain counsel of Contractor choice and sole cost and expense to represent the Company.

3.    The Parties shall notify each other within a reasonable period of time of any facts which might give rise to a claim, demand or suit for which a defense will be required regardless of whether or not the claim, demand or suit has been made or filed.

4.    If a demand of defense and indemnity is made and then accepted by Contractor, then the Company shall:

(a)    Afford Contractor a reasonable opportunity to investigate the facts relating to the claim, demand, or suit, including but not limited to interviewing witnesses, inspecting property and reviewing documents.

12

(b)    Cooperate at all times with Contractor's efforts to prepare the case, including but not limited to timely responding to interrogatories and document requests, making witnesses available for depositions and attending trial of the case.

5.    If a demand of defense and indemnity is made by the Company but rejected by Contractor, then upon a determination that Contractor owed a duty of defense under this Agreement, Contractor shall be held liable for any amount paid by the settling party without a need for a judicial determination as to whether the Company had potential liability to the claimant or whether the settlement amount was reasonable.

6.    Contractor agrees to allow any member of Company at any time to protect its interest by retaining its own counsel at its own expense to enter its appearance and prepare its defense regardless of any defense obligations that Contractor might otherwise have.

## VI.    REPORTS OF ACCIDENTS AND ENVIRONMENTAL INCIDENTS

A.    Contractor shall report in person or by telephone to Company as soon as practicable all accidents and/or occurrences resulting in injuries to Contractor's employees or third parties, spills or releases of pollutants and/or contaminants and pollution of the environment, or damage to property arising out of or during the course of the services performed by Contractor (regardless of whether such contracting or subcontracting is in violation of Article VIII of this Agreement).

B.    Contractor shall furnish Company with a copy of any reports made by Contractor of such accidents or occurrences. Contractor shall also prepare and make available all reports of accidents or occurrences resulting in pollution of the environment which may be required by federal, state, or local laws, orders

13

or regulations, including but not limited to the Clean Air Act, the Resource Conservation and Recovery Act (RCRA), the Clean Water Act, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, Title III of the Superfund Amendments and Reauthorization Act of 1986, and any and all amendments thereto.

## VII.    ASSIGNMENT

A.    Contractor may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Company. Any assignment shall not relieve Contractor of any of its obligations under this Agreement, including but not limited to the insurance, indemnity and defense obligations contained in Articles IV and V.

B.    Contractor may, however, assign to a third party any accounts receivable under this Agreement without such written approval if Contractor timely furnishes Company with documentation signed by Contractor and the third party establishing that the assignment has been made and identifying the rights assigned. In order to ensure that such assigned accounts receivable may be paid by Company promptly, to the correct payee, and in a manner which will protect the interests of all concerned, the Parties agree that a notification of an assignment of accounts receivable must: (a) conspicuously appear on the face of each invoice presented by Contractor and/or its assignee to Company for payment, (b) direct that payment of the invoice be made by check or other order instrument which is payable jointly to Contractor and Contractor's creditor, as assignee, and (c) specify the address at which such invoice should be paid.

C.    Company may assign this Agreement at any time without the prior consent of Contractor. In the event that Company is merged with another company that is affiliated with Company in any way, then the surviving entity of such merger shall be the successor to Company in this Agreement and this Agreement shall continue to be in full force and effect.

14

## VIII. SUBCONTRACTING

Contractor shall not contract or subcontract for any of the services to be performed or the goods to be provided under this Agreement without the prior written permission of Company. Any contractor or subcontractor of Contractor shall provide the same indemnity and insurance protection to Company as Contractor is required to provide pursuant to this Agreement. Regardless of the foregoing indemnity and insurance obligations of Contractor's contractors and subcontractors, Contractor shall remain liable and responsible for all obligations as set forth in this Agreement.

## IX. GIFTS AND GRATUITIES

Contractor shall not provide Company employees or any member of their immediate family with gifts, payments, extravagant entertainment, services or loans in any form. Gifts of nominal value and entertainment, meals, and social invitations that are customary and proper under the circumstances and do not place the recipient under obligation are acceptable. If any employee of the Company should solicit a gift or gratuity from the Contractor, Contractor hereby agrees to notify an officer of the Company of such act. It is agreed that the Company will hold such notification in confidence. Failure by the Contractor to comply with this paragraph XIX may, at the Company's option, result in the termination of this Agreement.

## X. EQUAL EMPLOYMENT OPPORTUNITY, OCCUPATIONAL SAFETY, HEALTH AND ENVIRONMENTAL COMPLIANCE

A. The provisions of Title VII of the Civil Rights Act of 1964 regarding equal employment opportunity, and any amendments, are incorporated by reference, and Contractor agrees to comply with them as well as all other rules and regulations promulgated pursuant to the Act.

15

B.      Contractor shall comply with all applicable local, state and federal environmental, occupational safety and health rules and regulations. These rules and regulations include, but are not limited to, regulations of the Occupational Safety and Health Administration (OSHA), the Bureau of Land Management and the United States Minerals Management Service. Further, Contractor shall comply with any posted safety rules including without limitation safety rules or policies prohibiting the use or possession of drugs, alcohol and contraband. Contractor shall also comply with Company's Substance Abuse Policy attached to this Agreement as Exhibit "C" and incorporated herein. Unless Contractor's employees are already bound by a substantially similar policy, Contractor agrees to communicate Company's Substance Abuse Policy to Contractor's employees and enforce it accordingly. Should the services to be performed by Contractor as set forth in Exhibit "A" fall within the rules and regulations of a governmental agency such as, by way of example, the Department of Transportation, then in such event Contractor shall institute and have in place a drug and alcohol testing program which complies with the rules and regulations of said governmental agency.

C.      . Contractor represents and warrants that each of its employees has received or shall receive immediately upon arrival sufficient training to be able to utilize Material Safety Data Sheets and to operate properly all safety equipment at the work site. Contractor also represents and warrants that it has trained each of its employees to perform his assigned work in a safe and competent manner so that the employee's actions will not endanger himself or others.

D.      Contractor represents and warrants that any equipment or supplies brought to the work site by it have been inspected, tested and properly maintained and that such equipment or supplies are free from defects and fit for their intended use.

16

E.    Contractor agrees to adhere to the applicable requirements of the Hazardous Communication Standard (29 CFR §1910.1200) as promulgated and enforced by OSHA and/or other federal, state and local government agencies.

F.    Contractor shall be responsible for making all reports and notifications required by law to appropriate government agencies regarding the identity, composition and amount of hazardous chemicals, substances and/or materials, if any, used or brought by Contractor to the work site.

## XI.   APPLICABLE LAW AND DISPUTE RESOLUTION

A.    The Parties agree and intend to provide that Pennsylvania law shall, except as otherwise provided in this Agreement, govern the interpretation of this Agreement and the rights of the Parties under this Agreement and any amendments hereto, without regard, however, to any choice of laws or conflict of laws provisions which would direct the application of the laws of another jurisdiction.

B.    Any dispute between the Parties that cannot be resolved by good faith negotiations shall be submitted to mediation as a condition precedent to any litigation. In the event of a dispute, the Parties agree to participate in mediation cooperatively and in good faith.

C.    The Parties agree that any dispute that cannot be settled through mediation shall be filed in a federal or state court in Allegheny County, Pennsylvania.

## XII.   ENTIRE AGREEMENT

A.    Unless the Parties agree otherwise in a written agreement which specifically identifies this Agreement by date of execution and signatories, any services requested by Company and any goods, equipment or facilities

17

purchased and/or leased by Company from Contractor shall be provided by Contractor under the terms of this Agreement. In the event of any conflict between this Agreement and Exhibit "A," any addendum or any work order or purchase order, this Agreement shall control. This Agreement supersedes all other agreements, oral or written, previously entered into with respect to the subject matter contained in this Agreement and the transactions which it contemplates, and it contains the entire agreement of the Parties, including without limitation all agreements with respect to warranties. Any agreement or stipulation in any work order, delivery ticket, purchase order, or other instrument used by Contractor and/or Company not in conformity with the terms and provisions of this Agreement shall be null and void.

B.     The Parties declare that they have contributed to the drafting of this Agreement or have had it reviewed by their counsel before signing it. It is expressly agreed that this Agreement shall not be construed against any party on the basis of who drafted this Agreement or who supplied the form of Agreement. Each party agrees that it has been purposefully drawn and correctly reflects their understanding of the transaction that it contemplates.

## XIII.  SEVERABILITY

If any provision of this Agreement is held to be partially or completely contrary to law and/or unenforceable, this Agreement shall be deemed to be amended to partially or completely modify such provision or portion thereof to the extent necessary to make it enforceable, or, if necessary, this Agreement shall be deemed to be amended to delete the unenforceable provision or portion thereof.

## XIV.  EFFECTIVE DATE

This Agreement shall be deemed to have been in full force and effect on the date first above written or on the date on which Contractor first commenced the performance of any services for Company or first provided goods, equipment

18

or facilities to Company, whichever first occurred, and even though this Agreement may not then have been reduced to writing.

## XV. WAIVER

No benefit or right accruing to either party under this Agreement or any amendment or addendum to Exhibit "A" shall be deemed to be waived unless the waiver is reduced to writing, expressly refers to this Agreement by date and signatories, and is signed by both Parties to this Agreement. The waiver, in one or more instances, of any act, condition or requirement stipulated in this Agreement shall not constitute a continuing waiver or a waiver of any other act, condition or requirement or a waiver of the same act, condition or requirement in other instances, unless specifically so stated in such written agreement.

## XVI. INFORMATION TO BE CONFIDENTIAL

Contractor represents and warrants that neither it nor any of its contractors or subcontractors (regardless of whether such contracting or subcontracting is in violation of Article VIII of this Agreement) will publish or release to any other party any materials or information relating to this Agreement without Company's written approval. Information gained by Contractor as a result of the performance of services and/or the provision of goods, equipment or facilities under this Agreement, including, but not limited to, depth, formations penetrated, the results of coring, testing and surveying, shall be confidential and shall not be revealed at any time by Contractor to third parties without the prior written approval of Company.

## XVII. TERMINATION OF WORK

Company may, at any time, in its sole discretion, terminate work covered by any work order, oral or written, issued hereunder, in which event Contractor shall be paid at the applicable rates stipulated in the Contractor's Rate Schedule or Bid for work rendered up to the date of such termination. In no event shall Contractor be entitled to be paid prospectively for work unperformed by reason of

such termination, nor shall Contractor be entitled to any other compensation or damages for loss of anticipated profits or otherwise. On notice of such termination, Contractor shall promptly remove its personnel, machinery, and equipment from the location and shall further cooperate with Company or its designee to ensure an orderly and expeditious transition and completion of the work.

The foregoing paragraph shall in no way limit Company's right to terminate Contractor without additional compensation in the event of Contractor's breach of this Agreement.

XVIII. TERMINATION OF THIS AGREEMENT

Upon execution of this Agreement and ongoing compliance with its terms, Company agrees that the name of Contractor shall be added to Company's approved list of CONTRACTORS and the Agreement shall remain in full force and effect until cancelled by either party. This Agreement may be terminated by either party by giving the other party ten (10) days advance notice in writing to that effect at the address set forth above. Such termination will not operate to relieve either party of any obligation arising from or incident to services performed or in progress prior to such time as this Agreement is terminated.

XIX. EXECUTION

A. The Parties have executed this Agreement, each representative warranting individually that (s)he has the full right, power and authority to execute it on behalf of the party (s)he represents.

B. In signing this agreement, contractor expressly acknowledges that it is aware of its right to obtain legal counsel to review this agreement. Furthermore, contractor expressly acknowledges that it has read and understands all of the provisions contained in this agreement, including without

20

limitation, the indemnity and release provisions, and agrees to all such provisions, as indicated by the signature of its representative below.

    C.    This Agreement may be executed by the use of counterpart signature pages.

CONTRACTOR:                               COMPANY:

Stric-Lan Companies LLC                   HG ENERGY, LLC

By: _____                By: _____

Title: Corp Vice-President                Title: Controller

21

## List of Attachments

Exhibit "A"    -    Scope of Work and Rate Schedule (Supplied by Contractor)

Exhibit "B"    -    Minimum Insurance Requirements

Exhibit "C"    -    Substance Abuse Policy

Vendor: Stric-Lan Companies LLC

Signed MSSA                                          [✓]        Dated:      10/1/12

Exhibit "A" Scope of Work and Rate Schedule         [ ]

Exhibit "B" - Certificate of Insurance

     Worker's Comp/Employer's Liability        [✓]        Expires:      10/1/13

     General Liability Insurance - $1,000,000   [✓]        Expires:      10/1/13

     Automobile Liability Insurance - $1,000,000 [✓]      Expires:      10/1/13

     Pollution Liability Insurance - $1,000,000 [ ]        Expires:      _____

Exhibit "C" - Substance Abuse Policy                [✓]

W-9                                                 [✓]   02-06 22060

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

STRIC01 OP ID: EY

DATE (MM/DD/YYYY): 10/04/12

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: Dawn Kidder, CIC |
|---|---|---|
| Regions Insurance, Inc. - LF<br>Suite 3000<br>400 East Kaliste Saloom Rd<br>Lafayette, LA 70508<br>Keith E. Poirier | 337-234-0568<br>337-234-0776 | PHONE (A/C, No, Ext): 337-234-0568  FAX (A/C, No): 337-234-0776<br>E-MAIL ADDRESS: dawn.kidder@regions.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURER A : | Berkley National Ins Co | 38911 |
| INSURED Stric-Lan Companies, LLC<br>Stric-Lan Companies Corp.<br>Stric-Lan Properties, LLC<br>104 Sable Street<br>Duson, LA 70529 | INSURER B : Liberty Mutual Fire Ins Co | 23035 |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES  CERTIFICATE NUMBER:  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE X OCCUR | | | EGL000177910 | 10/01/12 | 10/01/13 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | Empl Bene | $ 1,000,000 |
| A | AUTOMOBILE LIABILITY<br>X ANY AUTO<br>ALL OWNED AUTOS  SCHEDULED AUTOS<br>X HIRED AUTOS  X NON-OWNED AUTOS | | | ECA3101336-12 | 10/01/12 | 10/01/13 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR<br>EXCESS LIAB  CLAIMS-MADE<br>DED X RETENTION$ 10,000 | | | EUL000170010 | 10/01/12 | 10/01/13 | EACH OCCURRENCE | $ 19,000,000 |
| | | | | | | | AGGREGATE | $ 19,000,000 |
| | | | | | | | Pers/Adv | $ 19,000,000 |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  N  N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | WC1-641-443977-812 | 10/01/12 | 10/01/13 | X WC STATU-TORY LIMITS  OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| B | USL&H | | | WC1-641-443977-812 | 10/01/12 | 10/01/13 | /Accident | 1,000,000 |
| B | Maritime | | | WC1-641-443977-012 | 10/01/12 | 10/01/13 | /Disease | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
See Attached Notes for Additional Coverages and Endorsements

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| HGENSE1<br><br>HG Energy, LLC,<br>a West Virginia LLC<br>2200 Georgetown Drive, Suite 5<br>Sewickley, PA 15143 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*(signature)* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)  The ACORD name and logo are registered marks of ACORD

| NOTEPAD | INSURED'S NAME Stric-Lan Companies, LLC | STRIC01<br>OP ID: EY | PAGE 2<br>DATE 10/04/12 |

General Liability:
*Blanket Additional Insured as required by written contract
*Blanket Waiver of Subrogation as required by written contract
*Primary and Non-Contributory Wording as required by written contract
*US Federal Lease Blocks (incl State Waters & Gulf of Mexico) Extension
*In Rem Endorsement
*Action Over
*Blowout & Cratering
*Explosion, Collapse and Underground Damage (XCU)
*Sudden & Accidental Pollution Liability
*Contractual Liability
*Unlimited Non-Owned Watercraft
*Underground Resources & Equipment
*60 Days Notice of Cancellation except 10 Days for nonpayment of premium

Auto:
*Blanket Additional Insured as required by written contract
*Blanket Waiver of Subrogation as required by written contract
*Blanket Primary Insurance as required by written contract
*60 Days Notice of Cancellation except 10 Days for nonpayment
*$1,000 Collision Deductible; $1,000 Comprehensive Deductible

Workers Compensation/Employers Liability/USL&H/Maritime EL Pol #BB1113639:
*Maritime/Jones Act Coverage
*United States Longshore & Harbor Workers' Act Coverage
*Blanket Waiver of Subrogation as required by written contract
*Blanket Alternate Employer as required by written contract
*30 Days Notice of Cancellation
*Voluntary Compensation & Employers Liability Endorsement
*Transportation, Wages, Maintenance & Cure
*Outer Continental Shelf Lands Act Coverage
*Death on the High Seas
*Gulf of Mexico
*In Rem

Umbrella:
*Follow Form Coverage
*Blanket Additional Insured as required by written contract
*Blanket Waiver of Subrogation as required by written contract
*Gulf of Mexico Endorsement
*In Rem
*60 Days notice of Cancellation except 10 Days for nonpayment of premium

HG ENERGY, LLC
MASTER SERVICE AND SUPPLY AGREEMENT

EXHIBIT "C"

SUBSTANCE ABUSE POLICY

The purpose of this policy is to ensure that HG Energy, LLC maintains a work environment that is safe and conducive to high work standards and production. This policy covers the abuse of drugs and/or alcohol in the workplace by employees, applicants for employment, and contractors.

Possession, use, distribution, or being under the influence of or impaired by drugs while on the job or on Company property is prohibited and is cause for disciplinary action, including termination of employment. Unauthorized possession or use of alcohol, or being under the influence of alcohol while on the job or on company property, is prohibited and is cause for disciplinary action, including termination of employment.

The Company may employ drug and/or alcohol tests as follows: pre-employment, post accident or near miss, reasonable cause, random and post rehabilitation.

Employees and Contractors who perform work on certain gas pipelines that are jurisdictional to DOT CFR 49 Part 192 must be included in an anti-drug and alcohol misuse prevention program that meets all the requirements of the Regulation. Therefore, Contractor acknowledges by his/her signature below that all Contractor employees are included in a fully compliant program and agree to cooperate and provide any and all necessary documents and records requested by the Company to verify the Contractor's compliance with this Drug and Alcohol Testing requirement.

CONTRACTOR NAME:

Stric-Lan Companies, LLC

By: _____

Title: Co. Vice-President

| Form **W-9**<br>(Rev. December 2011)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give Form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

Name (as shown on your income tax return)

Stric-Lan Companies, LLC

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☑ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ P   ☐ Exempt payee

☐ Other (see instructions) ▶

Address (number, street, and apt. or suite no.)

104 Sable Street

City, state, and ZIP code

Duson, LA 70529

Requester's name and address (optional)

HG Energy LLC

2200 Georgetown Drive, Suite 501

Sewickley, PA  15143

List account number(s) here (optional)

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

Employer identification number

| 0 | 2 | – | 0 | 6 | 2 | 2 | 0 | 6 | 0 |

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

| Sign<br>Here | Signature of<br>U.S. person ▶ | Date ▶ 10/8/12 |
|---|---|---|

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 12-2011)

# EXHIBIT C



# Berkley National Insurance Company
## Urbandale, Iowa

## Energy Commercial General Liability Declarations

**Named Insured and Mailing Address**
Stric-Lan Companies, LLC
104 Sable Street
Duson, LA 70529

**Producer**
Regions Insurance of Louisiana III
400 East Kaliste Saloom Rd.
Suite 3000
Lafayette, LA 70508

(See Named Insured Schedule for a complete list of Named Insureds)

| | |
|---|---|
| **Policy Number**<br>EGL000177910 | **Previous Policy Number**<br>EGL000005111 |
| **Policy Period:**<br>From: 10/01/2012    To: 10/01/2013<br>12:01 A.M. Standard Time at your mailing address shown above. | **Form of Business:**  Limited Liability Company (LLC)<br><br>**Audit Period:** Annual |

## Energy Commercial General Liability Policy - EGL1000 03 10

**Limits of Liability:**

| | | |
|---|---|---|
| General Aggregate Limit | $ | 2,000,000 |
| Products-Completed Operations Aggregate Limit | $ | 2,000,000 |
| Each Occurrence Limit | $ | 1,000,000 |
| Personal & Advertising Injury Limit | $ | 1,000,000 |
| Damage to Premises Rented to You Limit | $ | 100,000 |
| Medical Expense Limit | $ | 5,000 |

**Forms and Endorsements:**    See Schedule of Forms and Endorsements

| | | |
|---|---|---|
| Estimated Premium: | $ | 79,735.00 |
| Terrorism Additional Premium: | $ | 0.00 |
| Deposit Premium: | $ | 79,735.00 |

**Name and Address of Administrative Office:**
Berkley Oil & Gas Specialty Services, LLC
10375 Richmond, Suite 1900
Houston, TX 77042
Phone No.: 832.308.6900    **See Claims Notice for Claims contact information**

THESE DECLARATIONS, TOGETHER WITH THE COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.

This policy is issued by one of the following stock companies as indicated on the Declarations Page.

**Berkley Regional Insurance Company**
1209 Orange Street
Wilmington, Delaware 19801

**Berkley National Insurance Company**
11201 Douglas Avenue
Urbandale, Iowa 50322

**StarNet Insurance Company**
1209 Orange Street
Wilmington, Delaware 19801

Administrative Office for the companies listed above:

**Berkley Oil & Gas Specialty Services, LLC**
10375 Richmond Avenue, Suite 1900
Houston, Texas 77042

**THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE DECLARATIONS PAGE.**

Berkley Regional Insurance Company

W. Robert Berkley, Jr.
President

Ira S. Lederman
Secretary

Berkley National Insurance Company

Craig Weldon Sparks
President

Ty Collin Simmons
Secretary

StarNet Insurance Company

W. Robert Berkley, Jr.
President

Ira S. Lederman
Secretary

**IN THE EVENT YOU SUFFER A LOSS OR ACCIDENT, YOU SHOULD CONTACT YOUR AGENT IMMEDIATELY**

Policy Number:   EGL000177910                                    Transaction Number:  001
Effective Date:   10/01/2012

# Schedule of Forms and Endorsements

**Forms and Endorsements that apply to this policy:**

| | |
|---|---|
| EGL1001 03 10 | Declarations Page |
| EIL1014 03 10 | Signature Page |
| EIL1002 03 10 | Schedule of Forms and Endorsements |
| EGL1007 03 10 | Composite Rate Endorsement |
| EIL1003 03 10 | Named Insured Schedule |
| EGL1000 03 10 | Energy Commercial General Liability Policy |
| EGL1209 03 10 | Louisiana Employee Benefits Liability Coverage |
| EGL1217 03 10 | Waste Definition Endorsement |
| EGL1286 03 10 | Non Owned Watercraft Length Extension |
| EGL1289 03 10 | Non-operating Working Interest Insurance Ranking Endorsement |
| EGL1290 03 10 | Oil Pollution Control Act |
| EGL1905 03 10 | Louisiana Earlier Notice of Cancellation Provided by Us |
| EGL2106 03 10 | Louisiana Changes - Insuring Agreement |
| EGL2107 03 10 | Louisiana Changes - Transfer Of Rights Of Recovery Against Others To Us Condition |
| EGL2108 03 10 | Louisiana Changes - Legal Action Against Us |
| EGL2162 03 10 | Exclusion of Certified Acts of Terrorism and Exclusion of Other Acts of Terrorism Committed Outside of the U.S. |
| EIL2318 03 10 | Louisiana Changes - Cancellation and Nonrenewal |

©Berkley Oil & Gas Specialty Services, LLC, 2010

Policy Number:  EGL000177910

Transaction Number:  001

Effective Date:  10/01/2012

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# Composite Rate Endorsement

This endorsement modifies insurance provided under the following:

Energy Commercial General Liability Policy

## SCHEDULE

| Premium Basis: | Exposure Basis: | Rate: | Per: | Estimated Premium: | Minimum Premium: |
|---|---|---|---|---|---|
| Land- WC Payroll excluding sales, clerical, and executive officers | $0- 1,841,000 | $ 26.00 | 1000 | $ 74,935.00 | $  N/A |
|  | $1,841,000 and up | $  21.00 |  |  |  |
| Wet- WC Payroll excluding sales, clerical, and executive officers | $150,000 | $  32.00 | 1000 | $4,800 |  |

Section VIII. General Conditions, Subsection M. Premium Audit, is replaced by the following:

**Premium Audit**

1.  WE will compute all premiums for this policy according to OUR rules and the composite rates shown in the Schedule above or attached hereto.

2.  The estimated premium shown in the Schedule of this endorsement for this policy is a deposit premium only.  The estimated premium is based on the exposure YOU told US YOU would have when this policy began.  At the close of each audit period WE will compute the final premium for the policy period by multiplying the composite rate against the audited exposure.

    When the premium basis is wells (other than wells to be drilled) or pipeline miles, the audited exposure will be the actual exposure at policy inception date averaged with the actual exposure at policy expiration.

    If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, WE will return the excess to the first NAMED INSURED; if less, the first NAMED INSURED will pay US the difference.  The final premium will not be less than the Minimum Premium shown in the Schedule above.  The due date for audit and retrospective premiums is the date shown as the due date on the bill.

3.  The first NAMED INSURED must keep records of the information WE need for premium computation, and send US copies at such times as WE may request.

© Berkley Oil & Gas Specialty Services, LLC, 2010

Policy Number: EGL000177910                                    Transaction Number: 001

Effective Date: 10/01/2012

# Named Insured

SCHEDULE

Stric-Lan Companies, LLC
Stric-Lan Companies Corp.
Stric-Lan Properties, LLC


Berkley
Oil&Gas

# ENERGY COMMERCIAL GENERAL LIABILITY POLICY

"Focusing On Your Energy Business"

## DEFINED TERMS

This policy contains certain words and phrases that have special meaning. These defined terms appear within this policy as **BOLDED AND CAPITALIZED**. As an example, **WE**, **US**, and **OUR**, refer to the company listed on the Declarations Page that insures **YOU**. **YOU** will find a list of these defined terms beginning on Page 25. For **YOUR** convenience, **WE** have provided an index of important topics beginning on Page 31.

## ABOUT THIS ENERGY COMMERCIAL GENERAL LIABILITY POLICY

This policy is specifically designed to insure companies in the oil and gas or energy business. This policy provides commercial general liability coverage to **YOU** and **YOUR** energy-related and other businesses. This policy describes who is covered by this policy, what is covered, and when and where there is coverage, as well as supplementary payments. As with any Insurance policy, there are certain limitations and exclusions to the coverage. **YOU** also have certain obligations and requirements which **YOU** must comply with in order to maintain the benefits under this policy. Lastly, there are endorsements to the policy that change the terms, conditions, and exclusions in the policy.

**YOU must read the entire policy to understand the terms, conditions, coverages, limitations, and exclusions contained in this policy.**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010



Berkley
Oil & Gas

# ENERGY COMMERCIAL GENERAL LIABILITY POLICY

"Focusing On Your Energy Business"

## TABLE OF CONTENTS

I.  NAMED INSUREDS AND INSUREDS ....................................................................................................3
    A.  NAMED INSUREDS ...............................................................................................................................3
    B.  INSUREDS ..........................................................................................................................................3
    C.  IN REM ACTION(S) ..............................................................................................................................5

II.  COVERAGES AND DUTY TO DEFEND ...............................................................................................5
    A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY...............................................................................5
    B.  POLLUTION CLEAN UP COSTS ..............................................................................................................5
    C.  PERSONAL AND ADVERTISING INJURY LIABILITY ....................................................................................6
    D.  MEDICAL PAYMENTS ...........................................................................................................................6
    E.  DUTY TO DEFEND ...............................................................................................................................6

III.  WHEN THERE IS COVERAGE ...........................................................................................................7

IV.  COVERAGE TERRITORY ...................................................................................................................7

V.  LIMITS OF INSURANCE ......................................................................................................................8

VI.  SUPPLEMENTARY PAYMENTS ........................................................................................................9

VII.  EXCLUSIONS.....................................................................................................................................10
    A.  BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, AND PERSONAL AND ADVERTISING
        INJURY EXCLUSIONS ........................................................................................................................10
    B.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY EXCLUSIONS...........................................................13
    C.  POLLUTION CLEAN UP COSTS EXCLUSIONS.........................................................................................17
    D.  PERSONAL AND ADVERTISING INJURY LIABILITY EXCLUSIONS ...............................................................18
    E.  MEDICAL PAYMENTS EXCLUSIONS .....................................................................................................19

VIII. GENERAL CONDITIONS ...................................................................................................................20

IX.  DEFINITIONS ......................................................................................................................................25

X.  INDEX ..................................................................................................................................................31

# ENERGY COMMERCIAL GENERAL LIABILITY POLICY

## I. NAMED INSUREDS AND INSUREDS

### A. Named Insureds

Each of the following is an INSURED if designated on the Declarations Page of this policy as a NAMED INSURED or satisfies the provisions in Section I.A.6. Newly Acquired or Formed Organizations:

1. **Individual**:

   If YOU are an Individual – YOU and YOUR spouse are INSUREDS, but only with respect to the conduct of a business of which YOU are the sole owner.

2. **Partnership or Joint Venture**:

   If YOU are a Partnership or Joint Venture – YOU, YOUR MEMBERS, YOUR partners, and their spouses are INSUREDS, but only with respect to the liability arising out of YOUR interest, or the conduct of YOUR business.

3. **Limited Liability Company**:

   If YOU are a Limited Liability Company – YOU and YOUR MEMBERS are INSUREDS, but only with respect to the conduct of YOUR business. YOUR MANAGERS are also INSUREDS, but only with respect to their duties as YOUR MANAGERS.

4. **Other Organization**:

   If YOU are an organization other than a Partnership, Joint Venture, or Limited Liability Company – YOU are an INSURED, but only with respect to the conduct of YOUR business.

5. **Trust**:

   If YOU are a Trust – YOU and YOUR trustees are INSUREDS, but only with respect to their duties as trustees to YOU.

6. **Newly Acquired or Formed Organizations**:

   Any Newly Acquired or Formed Organization (other than a Partnership or Joint Venture) over which YOU maintain ownership or majority interest will qualify as a NAMED INSURED if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 120th day after YOU acquire or form the organization or the end of the policy period, whichever is earlier; and

   b. Section II.A. Bodily Injury and Property Damage Liability and Section II.B. Pollution Clean Up Costs do not apply to BODILY INJURY or PROPERTY DAMAGE costs that occurred, or POLLUTION CLEAN UP COSTS that commenced, before YOU acquired or formed the organization. Section II.C. Personal and Advertising Injury Liability does not apply to PERSONAL AND ADVERTISING INJURY arising out of an offense committed before YOU acquired or formed the organization.

**If YOU own a NON-OPERATING WORKING INTEREST in any oil, gas, or other mineral property, then YOU are a NAMED INSURED, but only with respect to liability arising out of YOUR NON-OPERATING WORKING INTEREST in such oil, gas, or other mineral property.**

**No person or organization is an INSURED with respect to the conduct of any current or past Partnership or Joint Venture, or Limited Liability Company that is not shown as a NAMED INSURED on the Declarations Page.**

### B. Insureds

Each of the following is an INSURED with respect to the coverages set forth in Section II.A. Bodily Injury and Property Damage Liability, Section II.C. Personal and Advertising Injury Liability, and Section II.D. Medical Payments of this policy:

*Includes copyrighted material of Insurance Services Office, Inc.,*
*with its permission.*
© Berkley Oil & Gas Specialty Services, LLC, 2010

1. **Additional Insured**:

   Any person or organization with whom YOU agree in writing in a contract or agreement, to add as an Additional Insured on YOUR policy or to provide liability insurance for, but only with respect to liability arising out of YOUR operations, or liability arising out of premises owned by or rented to YOU.

   In addition, the written contract or written agreement requiring YOU to include a person or organization as an Additional Insured must be in affect during the policy period and executed before the BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY occurred. Furthermore, the insurance provided will not exceed the lesser of:

   a. The coverage and/or limits of this policy; or

   b. The coverage and/or limits required by said contract or agreement.

2. **Employees and Volunteer Workers**:

   YOUR EMPLOYEES, but only for acts within the scope of their employment by YOU or while performing duties related to the conduct of YOUR business; and VOLUNTEER WORKERS, but only while acting at YOUR direction and performing duties related to the conduct of YOUR business.

   However, neither YOUR EMPLOYEES nor VOLUNTEER WORKERS are INSUREDS for:

   a. BODILY INJURY or PERSONAL AND ADVERTISING INJURY:

      (1) To YOU, to YOUR partners or MEMBERS (if YOU are a Partnership or Joint Venture), to YOUR MEMBERS (if YOU are a Limited Liability Company), to another EMPLOYEE while in the course of his or her employment or performing duties related to the conduct of YOUR business, or to other VOLUNTEER WORKERS while performing duties related to the conduct of YOUR business;

      (2) To the spouse, child, parent, or sibling of that co-EMPLOYEE or VOLUNTEER WORKER as a consequence of Subparagraph a.(1) above;

      (3) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Subparagraphs a.(1) or (2) above; or

      (4) Arising out of his or her providing or failing to provide professional health care services.

   With respect to BODILY INJURY only, the limitation in Subparagraph a. above does not apply to:

      (1) YOU or YOUR directors, MANAGERS, MEMBERS, EXECUTIVE OFFICERS, partners, or supervisors as INSUREDS; or

      (2) YOUR EMPLOYEES, as INSUREDS, with respect to such damages because of first aid services administered by such an EMPLOYEE.

   b. PROPERTY DAMAGE to property:

      (1) Owned, occupied, or used by; or

      (2) Rented to, in the care, custody, or control of, or over which physical control is being exercised for any purpose by;

      YOU, any of YOUR EMPLOYEES, VOLUNTEER WORKERS, any partner or MEMBER (if YOU are a Partnership or Joint Venture), or any of YOUR MEMBERS (if YOU are a Limited Liability Company).

3. **Executive Officers and Directors**:

   EXECUTIVE OFFICERS and Directors to the extent that YOU have EXECUTIVE OFFICERS and Directors, but only with respect to their duties as YOUR EXECUTIVE OFFICERS or directors.

4. **Legal Representative**:

   YOUR LEGAL REPRESENTATIVE if YOU die, but only with respect to duties as YOUR LEGAL REPRESENTATIVE. The LEGAL REPRESENTATIVE will have all YOUR rights and duties under this policy.

5. **Non-operating Working Interest Owner**:

   A person or organization owning a NON-OPERATING WORKING INTEREST, but only when YOU have agreed in writing in a contract or agreement (including, but not limited to, a Joint Operating Agreement) to provide insurance coverage for the

*Includes copyrighted material of Insurance Services Office, Inc., with its permission.*
© Berkley Oil & Gas Specialty Services, LLC, 2010

benefit of the person or organization owning a **NON-OPERATING WORKING INTEREST** in any oil, gas, or other mineral property in which **YOU** are the **OPERATOR**. In addition, the written contract or agreement requiring **YOU** to include a **NON-OPERATING WORKING INTEREST** must be in effect during the policy period and executed before the **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL AND ADVERTISING INJURY** occurred. However, the person or organization owning a **NON-OPERATING WORKING INTEREST** is an **INSURED**, only with respect to liability arising out of the **NON-OPERATING WORKING INTEREST**. Furthermore, the insurance provided will not exceed the lesser of:

a. The coverage and/or limits of this policy; or

b. The coverage and/or limits required by said contract or agreement.

### 6. Permissive User of Mobile Equipment:

With respect to **MOBILE EQUIPMENT** registered in **YOUR** name under a motor vehicle registration law:

a. Persons driving such equipment on a public road with **YOUR** permission; and

b. Persons or organizations responsible for the conduct of such persons described in Subparagraph a. above, but only with respect to the operation of the equipment and only if no other insurance of any kind is available to them.

However, no person or organization is an **INSURED** with respect to **BODILY INJURY** to any co-**EMPLOYEE** of the person driving the equipment, or **PROPERTY DAMAGE** to any property owned or occupied by or loaned or rented to **YOU** or in **YOUR** charge, or the charge of the employer of any person who is an **INSURED** under this provision.

### 7. Real Estate Manager:

Any person (other than **YOUR EMPLOYEE** or **VOLUNTEER WORKER**) or organization while acting as **YOUR** Real Estate Manager, but only with respect to their duties as **YOUR** Real Estate Manager. However, Real Estate Manager does not include any person or organization providing services to **YOU** with regard to **YOUR** oil and gas leases including, without limitation, the person commonly referred to as a landman.

### 8. Stockholders:

To the extent that **YOU** have Stockholders, they and their spouses, but only with respect to their liability as Stockholders.

### 9. Temporary Custodian:

Any person or organization having proper temporary custody of **YOUR** property if **YOU** die, but only:

a. With respect to liability arising out of the maintenance or use of that property; and

b. Until **YOUR LEGAL REPRESENTATIVE** has been appointed.

### C. In Rem Action(s)

In Rem Action(s) against any watercraft owned or operated by, rented by, chartered by, or loaned to the **INSURED** will in all respects be treated in the same manner as though the action were in Personam against that **INSURED**.

## II. COVERAGES AND DUTY TO DEFEND

### A. Bodily Injury and Property Damage Liability

**WE** will pay the amounts that an **INSURED** becomes legally obligated to pay as damages because of **BODILY INJURY** or **PROPERTY DAMAGE** caused by an **OCCURRENCE** for which this policy applies.

### B. Pollution Clean Up Costs

**WE** will pay the amounts that **YOU** voluntarily incur or become legally obligated to pay as **POLLUTION CLEAN UP COSTS** because of a **POLLUTION INCIDENT** which has commenced at or from **YOUR OIL OR GAS SITE** or **YOUR WORK** at an **OIL OR GAS SITE**, provided the following **ELIGIBLE POLLUTION INCIDENT** requirements are met:

1. The **POLLUTION INCIDENT** is both unexpected and unintended from the standpoint of the **INSURED**;

2. The **POLLUTION INCIDENT** commenced abruptly and instantaneously and can be identified as having first commenced during the policy period;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

Section II. Coverages and Duty to Defend

3. The POLLUTION INCIDENT was known by any INSURED, AGENT, OPERATOR, or OIL OR GAS SITE CONTRACTOR within 30 days of the commencement of the POLLUTION INCIDENT; and

4. The POLLUTION INCIDENT was reported to BERKLEY OIL & GAS SPECIALTY SERVICES, LLC as soon as practicable but no later than 90 days from the date of knowledge of the commencement of the POLLUTION INCIDENT.

However, if YOU own a NON-OPERATING WORKING INTEREST in an OIL OR GAS SITE that has a POLLUTION INCIDENT, YOU must report to BERKLEY OIL & GAS SPECIALTY SERVICES, LLC as soon as practicable but no later than 120 days from the date of knowledge of the commencement of the POLLUTION INCIDENT.

C. Personal and Advertising Injury Liability

WE will pay the amounts that an INSURED becomes legally obligated to pay as damages because of a PERSONAL AND ADVERTISING INJURY caused by an offense for which this policy applies.

D. Medical Payments

1. WE will pay medical expenses for BODILY INJURY caused by an OCCURRENCE:

   a. On premises YOU own or rent;

   b. On ways next to premises YOU own or rent; or

   c. Because of YOUR operations;

   .    provided that:

      (1) The OCCURRENCE takes place in the Coverage Territory and during the policy period;

      (2) The expenses are incurred and reported to US within one year of the date of the OCCURRENCE; and

      (3) The injured person submits to examination, at OUR expense, by physicians of OUR choice as often as WE reasonably require.

2. WE will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. WE will pay reasonable expenses for:

   a. First aid administered at the time of an OCCURRENCE;

   b. Necessary medical, surgical, x-ray, and dental services, including prosthetic devices; and

   c. Necessary ambulance, hospital, professional nursing, and funeral services.

E. Duty to Defend

WE will have the right and Duty to Defend the INSURED, including without limitation, to appoint counsel to represent the INSURED against any CLAIM or SUIT seeking damages, or POLLUTION CLEAN UP COSTS arising out of an ELIGIBLE POLLUTION INCIDENT, to which this policy applies. However, WE will have no Duty to Defend the INSURED against any CLAIM or SUIT seeking damages, or POLLUTION CLEAN UP COSTS, to which this policy does not apply.

WE may at OUR discretion, investigate any OCCURRENCE, POLLUTION INCIDENT, or offense and settle any CLAIM or SUIT that may result. But:

1. The amount WE will pay for damages or POLLUTION CLEAN UP COSTS is limited as described in Section V. Limits Of Insurance; and

2. OUR right and Duty to Defend ends when WE have used up the applicable limit of insurance in the payment of judgments or settlements under Section II.A. Bodily Injury and Property Damage Liability, Section II.C. Personal and Advertising Injury Liability, or medical expenses under Section II.D. Medical Payments or POLLUTION CLEAN UP COSTS paid under Section II.B. Pollution Clean Up Costs.

**Other than as provided pursuant to Section VI. Supplementary Payments, WE have no other obligation or liability to pay sums or perform any acts or services.**

## III. WHEN THERE IS COVERAGE

A. This policy applies to Bodily Injury and Property Damage Liability, Pollution Clean Up Costs, and Personal and Advertising Injury Liability only if:

   1. The BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY is caused by an OCCURRENCE or offense, or the POLLUTION CLEAN UP COSTS are caused by an ELIGIBLE POLLUTION INCIDENT that takes place in the Coverage Territory described in Section IV. Coverage Territory;

   2. The BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY occurs during the policy period;

   3. The POLLUTION INCIDENT commences during the policy period;

   4. Prior to the policy period, no INSURED and no EMPLOYEE, authorized by YOU to give or receive notice of an OCCURRENCE , offense, or CLAIM, knew that the BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY had occurred, in whole or in part. If such an INSURED or authorized EMPLOYEE knew, prior to the policy period, that the BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY occurred, then any continuation, change, or resumption of such BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY during or after the policy period, will be deemed to have been known prior to the policy period; and

   5. Prior to the policy period, no INSURED, AGENT, OPERATOR, or OIL or GAS SITE CONTRACTOR knew that the POLLUTION CLEAN UP COSTS or the POLLUTION INCIDENT had commenced, in whole or in part. If any INSURED, AGENT, OPERATOR, or OIL OR GAS SITE CONTRACTOR knew, prior to the policy period, that the POLLUTION CLEAN UP COSTS or the POLLUTION INCIDENT commenced, then any continuation, change, or resumption of POLLUTION CLEAN UP COSTS or the POLLUTION INCIDENT during or after the policy period will be deemed to have been known prior to the policy period.

B. BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY which occurs during the policy period, and prior to the policy period, was not known to have occurred by any NAMED INSURED or any EMPLOYEE authorized by YOU to give or receive notice of an OCCURRENCE, offense, or CLAIM, includes any continuation, change, or resumption of that BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY after the end of the policy period.

C. BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY will be deemed to have been known to have occurred at the earliest time when any NAMED INSURED or any EMPLOYEE who is authorized by YOU to give or receive notice of an OCCURRENCE or CLAIM:

   1. Reports all, or any part, of the BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY to BERKLEY OIL & GAS SPECIALTY SERVICES, LLC or any insurer;

   2. Receives a written or verbal demand or CLAIM for damages because of the BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY; or

   3. Becomes aware by any other means that BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY has occurred or has begun to occur.

   Subsection C. above does not apply to BODILY INJURY and PROPERTY DAMAGE resulting from an ELIGIBLE POLLUTION INCIDENT.

D. Damages because of BODILY INJURY include damages claimed by any person or organization for care, loss of services, or death resulting at any time from the BODILY INJURY.

## IV. COVERAGE TERRITORY

This policy applies to CLAIMS or SUITS, arising from OCCURRENCES or offenses, in the United States of America (including its territories and possessions), United States Federal Lease Blocks managed by the Minerals Management Services (including state waters), Puerto Rico, and Canada. It also applies to International waters and airspace, as long as the injury or damage occurs in the course of travel or transportation between the United States of America (including its territories and possessions), United States Federal Lease Blocks managed by the Minerals Management Services (including state waters), Puerto Rico, and Canada. Coverage also applies to other parts of the world for injury or damages arising out of:

---

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

A. Goods or products made or sold by YOU;

B. Activities of a person whose home is in the United States of America (including its territories and possessions), Puerto Rico, and Canada, but is away for a short time period on YOUR business; or

C. PERSONAL AND ADVERTISING INJURY offenses that take place through the Internet or other similar electronic means of communication;

as long as an INSURED's liability to pay damages is determined in a SUIT on the merits in the United States of America (including its territories and possessions), Puerto Rico, or Canada.

## V. LIMITS OF INSURANCE

A. The Limits Of Insurance shown on the Declarations Page and the terms below fix the most WE will pay regardless of the number of:

1. INSUREDS;

2. CLAIMS made or SUITS brought; or

3. Persons or organizations making CLAIMS or bringing SUITS.

B. The General Aggregate Limit is the most WE will pay for the sum of:

1. Medical expenses under Section II.D. Medical Payments;

2. Damages under Section II.A. Bodily Injury and Property Damage Liability, except damages because of BODILY INJURY or PROPERTY DAMAGE included in the PRODUCTS-COMPLETED OPERATIONS HAZARD;

3. POLLUTION CLEAN UP COSTS under Section II. B. Pollution Clean Up Costs; and

4. Damages under Section II.C. Personal and Advertising Injury Liability.

C. The Products-Completed Operations Aggregate Limit is the most WE will pay under Section II.A. Bodily Injury and Property Damage Liability for damages because of BODILY INJURY and PROPERTY DAMAGE included in the PRODUCTS-COMPLETED OPERATIONS HAZARD.

D. Subject to Subsection B. above, the PERSONAL AND ADVERTISING INJURY Limit is the most WE will pay under Section II.C. Personal and Advertising Injury Liability for the sum of all damages because of all PERSONAL AND ADVERTISING INJURY sustained by any one person or organization.

E. Subject to Subsection B. or C. above, whichever applies, the Each Occurrence Limit is the most WE will pay for the sum of:

1. Damages under Section II.A. Bodily Injury and Property Damage Liability;

2. POLLUTION CLEAN UP COSTS under Section II.B. Pollution Clean Up Costs; and

3. Medical expenses under Section II.D. Medical Payments;

because of all BODILY INJURY, PROPERTY DAMAGE, and POLLUTION CLEAN UP COSTS arising out of any one OCCURRENCE or POLLUTION INCIDENT. The Each Occurrence Limit will apply to all BODILY INJURY, PROPERTY DAMAGE, and POLLUTION CLEAN UP COSTS arising out of any one NAMED STORM.

F. Subject to Subsection E. above, the Damage To Premises Rented To You Limit is the most WE will pay under Section II. A. Bodily Injury and Property Damage Liability for damages because of PROPERTY DAMAGE to any one premises, while rented to YOU, or in the case of damage by fire, while rented to YOU or temporarily occupied by YOU with permission of the owner.

G. Subject to Subsection E. above, the Medical Payments Limit is the most WE will pay under Section II.D. Medical Payments for all medical expenses because of BODILY INJURY sustained by any one person.

The Limits Of Insurance of this policy apply to the policy period shown on the Declarations Page. If the existing policy period is extended after issuance for an additional period that is less than 12 months, the additional period will be deemed part of the last preceding period for purposes of determining the Limits Of Insurance.

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

## VI. SUPPLEMENTARY PAYMENTS

A. WE will pay, with respect to any CLAIM WE investigate or settle, or any SUIT against an INSURED WE defend:

### 1. Bail Bonds:

Up to $2,000 for the cost of Bail Bonds. WE do not have to furnish these Bail Bonds.

### 2. Bonds to Release Attachments:

The cost of Bonds to Release Attachments, but only for bond amounts within the applicable limit of insurance. WE do not have to furnish these bonds.

### 3. Control of Well Expenses:

Up to $50,000 for CONTROL OF WELL EXPENSES related to CONTROL OF WELL ACTIVITIES required to be undertaken by or on behalf of the NAMED INSURED because of a CONTROL OF WELL INCIDENT arising from a PRODUCING WELL on dry land.

### 4. Court Costs:

All Court Costs taxed against the INSURED in the SUIT. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the INSURED.

### 5. Expenses:

All Expenses WE incur. Expenses, pursuant to Paragraph 5., include media expenses that WE incur in an amount not to exceed $10,000 if WE choose at OUR option to incur media expenses.

### 6. Investigation and Defense Expenses Incurred by You at Our Request:

All reasonable expenses incurred by the INSURED at OUR request to assist US in the investigation or defense of the CLAIM or SUIT, including actual loss of earnings up to $1,000 a day because of time off from work.

### 7. Prejudgment Interest:

Prejudgment Interest awarded against the INSURED on that part of the judgment WE pay. If WE make an offer to pay the applicable limit of insurance, WE will not pay any Prejudgment Interest based on that period of time after the offer.

### 8. Post Judgment Interest:

All interest on the full amount of any judgment that accrues after entry of the judgment and before WE have paid, offered to pay or deposited in court the part of the judgment that is within the applicable limit of insurance.

### B. Indemnitee Defense Expenses

If an INDEMNITEE of the INSURED is named as a party to a SUIT, WE will defend that INDEMNITEE if all of the following conditions have been met:

1. The SUIT against the INDEMNITEE seeks damages for which the INSURED has assumed the liability of the INDEMNITEE in a written contract or agreement that is an INSURED CONTRACT;

2. This policy applies to such liability assumed by the INSURED;

3. The obligation to defend, or the cost of the defense of, that INDEMNITEE, has also been assumed by the INSURED in the same INSURED CONTRACT;

4. The INDEMNITEE agrees to cooperate with US and allows US to conduct and control the defense of the INDEMNITEE including, but not limited to, appointing counsel;

5. The INDEMNITEE agrees to and does immediately send US copies of any demands, notices, summonses, or legal papers received in connection with the SUIT; and

6. The INDEMNITEE provides US with written authorization to obtain records and other information related to the SUIT.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

If conditions 1., 2., and 3. are met, but the INDEMNITEE fails to comply with conditions 4., 5.,or 6., then WE will still defend the INDEMNITEE but the attorneys fees and litigation expenses that WE incur will be deemed to be damages because of BODILY INJURY or PROPERTY DAMAGE and will reduce the applicable limit of insurance.

OUR obligation to make any Supplementary Payments, as respects Subsections A. and B. above, ends when WE have used up the applicable limit of insurance through payments of judgments, settlements, or POLLUTION CLEAN UP COSTS. Supplementary Payments will not reduce the applicable limit of insurance. Supplementary Payments do not include any fine or other penalty.

## VII. EXCLUSIONS

A. Bodily Injury, Property Damage, Pollution Clean Up Costs, and Personal and Advertising Injury Exclusions

The following Exclusions apply to Section II.A. Bodily Injury and Property Damage Liability, B. Pollution Clean Up Costs, and C. Personal and Advertising Injury Liability;

This policy does not apply to:

1. Acid Rain:

   a. BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY arising out of the actual, alleged, suspected presence, physical exposure, or threat of exposure to ACID RAIN.

   b. Any loss, cost, or expense including, but not limited to, defense costs, CLAIM expenses, bonds, or fees arising out of:

      (1) Any CLAIM, SUIT, request, demand, or order that any INSURED or others identify, abate, test for, sample, monitor, clean up, remove, cover, contain, treat, detoxify, decontaminate, neutralize, mitigate, or in any way respond to, or assess the effects of ACID RAIN; or repair, replace, or improve any property as a result of such effects; or

      (2) Any CLAIM, SUIT, request, demand, or order by or on behalf of a government authority for damages because of identification of, abatement of, testing for, sampling, monitoring, cleaning up, removing, covering, containing, treating, detoxifying, decontaminating, neutralizing, mitigating, or in any way responding to or assessing the effects of ACID RAIN; or repairing, replacing, or improving any property as a result of such effects.

2. Asbestos, Lead, Radioactive Material, or Silica And Silica-Related Dust:

   a. BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY arising out of the actual, alleged, or suspected:

      (1) Ingestion of, inhalation of, absorption of, presence of, physical exposure to, threatened exposure to, contact with, threatened contact with, or existence of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST in any form, including, but not limited to, goods or products containing any form of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST;

      (2) Use of any form of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST in constructing or manufacturing any good, product, or structure;

      (3) Removal of any form of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST from any good, product, or structure; or

      (4) The manufacture, intellectual development, sale, transportation, storage, or disposal of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST, or goods or products containing any form of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST.

   b. Any loss, cost, or expense including, but not limited to, defense costs, CLAIM expenses, bonds, or fees arising out of:

      (1) Any CLAIM, SUIT, request, demand, or order that any INSURED or others identify, abate, test for, sample, monitor, clean up, remove, cover, contain, treat, detoxify, decontaminate, neutralize, or mitigate, or in any way respond to, or assess the effects of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST; or repair, replace, or improve any property as a result of such effects; or

*Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.*
© Berkley Oil & Gas Specialty Services, LLC, 2010

(2) Any CLAIM, SUIT, request, demand, or order by or on behalf of a government authority for damages because of identification of, abatement of, testing for, sampling, monitoring, cleaning up, removing, covering, containing, treating, detoxifying, decontaminating, neutralizing, mitigating, or in any way responding to or assessing the effects of ASBESTOS, LEAD, RADIOACTIVE MATERIAL, or SILICA and SILICA-RELATED DUST; or repairing, replacing, or improving any property as a result of such effects.

This Exclusion does not apply to RADIOACTIVE MATERIAL while used in well logging or measuring tools.

3. **Control Of Well Expenses**:

CONTROL OF WELL EXPENSES arising out of a CONTROL OF WELL INCIDENT.

This Exclusion does not apply to:

a. Damages caused by YOUR WORK resulting in a CONTROL OF WELL INCIDENT, unless YOU are the OPERATOR or own a NON-OPERATING WORKING INTEREST in the well, or YOU have assumed liability for a CONTROL OF WELL INCIDENT by contract or agreement for the well, including, but not limited to, a turnkey work agreement, or YOU or someone on YOUR behalf was obligated to obtain Control Of Well or other similar insurance, regardless of whether such insurance is in force or the limits of liability are available; or

b. CONTROL OF WELL EXPENSES expressly provided for in Section VI.A.3. Control Of Well Expenses.

4. **Employment-Related Practices**:

a. BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, PERSONAL AND ADVERTISING INJURY, or any other damages sustained at any time by any person, whether or not sustained in the course of employment by an INSURED, arising directly or indirectly out of any employment-related act, omission, policy, practice, or representation directed at such person, occurring in whole or in part at any time, including any:

   (1) Arrest, detention, or imprisonment;

   (2) Breach of any express or implied covenant;

   (3) Coercion, criticism, humiliation, prosecution, or retaliation;

   (4) Defamation or disparagement;

   (5) Demotion, discipline, evaluation, or reassignment;

   (6) Discrimination, harassment, or segregation;

   (7) Eviction, invasion, or other violation of any right of occupancy;

   (8) Failure or refusal to advance, compensate, employ, or promote;

   (9) Invasion or other violation of any right of privacy or publicity;

   (10) Termination of employment; or

   (11) Other employment-related act, omission, policy, practice, representation, or relationship in connection with any INSURED at any time.

b. Any damages sustained by the spouse, child, parent, or sibling of such a person as a consequence of damages to that person at whom any Employment-Related Practice as described in Subparagraph a. is directed.

This Exclusion applies whether the INSURED may be liable as an employer or in any other capacity; and to any obligation to share damages with or repay someone else who must pay damages because of any of the foregoing.

5. **Enhancement, Maintenance, or Capital Expenditures**:

Any loss, cost, or expense incurred by YOU or others after an OCCURRENCE or POLLUTION INCIDENT, for any:

a. Enhancement or maintenance of any property; or

b. Expenditure or improvement that would qualify as a CAPITAL EXPENDITURE.

Section VII. Exclusions

6. **Fines or Penalties:**

Any criminal, civil, or administrative fine or penalty. This Exclusion does not apply to punitive or exemplary damages, if insuring such damages is not illegal or against public policy under the law of the jurisdiction pursuant to which this policy is construed.

7. **Fungi or Bacteria:**

a. BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY which would not have occurred, in whole or in part, but for the actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any FUNGI or Bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material, or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost, or expense including, but not limited to, defense costs, CLAIM expenses, bonds, or fees arising out of:

(1) Any CLAIM, SUIT, request, demand, or order that any INSURED or others identify, abate, test for, sample, monitor, clean up, remove, cover, contain, treat, detoxify, decontaminate, neutralize, mitigate, or in any way respond to or assess the effects of FUNGI or Bacteria; or repair, replace, or improve any property as a result of such effects; or

(2) Any CLAIM, SUIT, request, demand, or order by or on behalf of a government authority for damages because of identification of, abatement of, testing for, sampling, monitoring, cleaning up, removing, covering, containing, treating, detoxifying, decontaminating, neutralizing, mitigating, or in any way responding to or assessing the effects of FUNGI or Bacteria; or repairing, replacing, or improving any property as a result of such effects.

8. **Government Identified Contaminated Site:**

BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY arising out of any GOVERNMENT IDENTIFIED CONTAMINATED SITE.

9. **Nuclear Energy:**

a. BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY:

(1) With respect to which an INSURED under this policy also has status as an INSURED under a Nuclear Energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would have had status as an INSURED under any such policy but for its termination upon exhaustion of its limits of insurance; or

(2) Arising out of the NUCLEAR HAZARDOUS PROPERTIES of NUCLEAR MATERIAL and with respect to which:

(i) Any person or organization is required to maintain financial protection pursuant to the United States of America Atomic Energy Act of 1954, or any law amending that Act; or

(ii) Any INSURED is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency of the United States of America with any person or organization.

b. BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY arising out of NUCLEAR HAZARDOUS PROPERTIES of NUCLEAR MATERIAL:

(1) If the NUCLEAR MATERIAL:

(i) Is at any NUCLEAR FACILITY owned by, or operated by, or on behalf of, any INSURED;

(ii) Has been discharged or dispersed from that NUCLEAR FACILITY;

(iii) Is contained in NUCLEAR SPENT FUEL or NUCLEAR WASTE at any time transported, handled, stored, disposed of, processed, treated, possessed, or used by or on behalf of any INSURED; or

(2) In any way related to the furnishing by an INSURED of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any NUCLEAR FACILITY. But if such facility is located within the United States of America (including its possessions or territories) or Canada, this Subparagraph (2), applies only to NUCLEAR PROPERTY DAMAGE to such NUCLEAR FACILITY and any property there at.

10. **Recall of Products, Work, or Impaired Property**:

Any loss, cost, or expense incurred by YOU or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of:

a. YOUR PRODUCT;

b. YOUR WORK; or

c. IMPAIRED PROPERTY;

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

11. **Recording and Distribution of Material or Information in Violation of Law**:

BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA) including any amendment of or addition to such law;

b. The CAN-SPAM Act of 2003 including any amendment of or addition to such law;

c. The Fair Credit Reporting Act (FCRA) and any amendment of or addition to such law including the Fair and Accurate Credit Transaction Act (FACTA); or

d. Any federal, state, or local statute, ordinance, or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating, or distribution of material or information.

12. **War**:

BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY, however caused, arising out of WAR.

13. **Workers' Compensation or Similar Laws**:

Any obligation of the INSURED under any state or federal Workers' Compensation, disability benefits, or unemployment compensation law or any similar law.

Exclusions in Paragraphs 10. and 12. above, do not apply to damage by fire to premises while rented to YOU or temporarily occupied by YOU with permission of the owner. A separate limit of insurance applies to this coverage as described in Section V. Limits Of Insurance.

B. **Bodily Injury and Property Damage Liability Exclusions**

In addition to those Exclusions listed above in Section VII.A., the following Exclusions apply to Section II.A. Bodily Injury and Property Damage Liability;

This policy does not apply to:

1. **Aircraft, Auto, or Watercraft**:

BODILY INJURY or PROPERTY DAMAGE arising out of the ownership, maintenance, use, or entrustment to others of any Aircraft, AUTO, or Watercraft owned or operated by, rented by, chartered by, or loaned to any INSURED. Use includes operation and LOADING OR UNLOADING.

This Exclusion applies even if the CLAIMS against any INSURED allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that INSURED, if the OCCURRENCE which caused the BODILY INJURY or PROPERTY DAMAGE involved the ownership, maintenance, use, or entrustment to others of any Aircraft, AUTO, or Watercraft that is owned or operated by, rented by, chartered by, or loaned to any INSURED.

This Exclusion does not apply to:

a. A watercraft while ashore on premises YOU own or rent;

b. A watercraft YOU do not own that is:

     (1) Less than 100 feet long; and

     (2) Not being used by YOU to carry persons or property for a charge;

c. Parking an AUTO on, or on the ways next to, premises YOU own or rent, provided the AUTO is not owned by or rented or loaned to YOU or any INSURED;

d. Liability assumed under any INSURED CONTRACT for the ownership, maintenance, or use of aircraft or watercraft. However, this Exclusion will apply to BODILY INJURY, PROPERTY DAMAGE, or any other loss, cost, or expense that may be recoverable under the INSURED's or OPERATOR's Hull, Protection & Indemnity coverage, including CLAIMS for contractual liability; Marine Operators/Charterer's Liability coverage, or any similar marine insurance coverages on owned, operated, chartered, or brokered watercraft; or

e. BODILY INJURY or PROPERTY DAMAGE arising out of:

     (1) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of MOBILE EQUIPMENT if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

     (2) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of MOBILE EQUIPMENT.

2. **Contractual Liability:**

BODILY INJURY or PROPERTY DAMAGE for which the INSURED is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

This Exclusion does not apply to liability for damages:

a. That the INSURED would have in the absence of the contract or agreement; or

b. Assumed in a contract or agreement that is an INSURED CONTRACT, provided the BODILY INJURY or PROPERTY DAMAGE occurs after the execution of the contract or agreement.

3. **Damage to Impaired Property or Property Not Physically Injured:**

PROPERTY DAMAGE to IMPAIRED PROPERTY or property that has not been physically injured, arising out of:

a. A defect, deficiency, inadequacy, or dangerous condition in YOUR PRODUCT or YOUR WORK; or

b. A delay or failure by YOU or anyone acting on YOUR behalf to perform a contract or agreement in accordance with its terms.

This Exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to YOUR PRODUCT or YOUR WORK after it has been put to its intended use.

4. **Damage to Property:**

PROPERTY DAMAGE to:

a. Property YOU own, rent, or occupy including any loss, costs, or expenses incurred by YOU or any other person or organization, for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b. Premises YOU sell, give eway, or abandon, if the PROPERTY DAMAGE arises out of any part of those premises;

c. Property loaned to YOU;

d. Personal property in the care, custody, or control of the INSURED. This Exclusion does not apply to UNDERGROUND OILFIELD EQUIPMENT of others if YOU are an OILFIELD SERVICES CONTRACTOR;

e. That particular part of real property on which YOU or any contractors or subcontractors working directly or indirectly on YOUR behalf are performing operations, if the PROPERTY DAMAGE arises out of those operations. This Exclusion does not apply to PROPERTY DAMAGE to UNDERGROUND RESOURCES or the WELL BORE, for which YOU have no ownership interest; however, this Exclusion will apply to PROPERTY DAMAGE to that specific part of the WELL BORE on which YOU are actually working; or

 *Includes copyrighted material of Insurance Services Office, Inc., with its permission.*
© Berkley Oil & Gas Specialty Services, LLC, 2010

f. That particular part of any property that must be restored, repaired, or replaced because **YOUR WORK** was incorrectly performed on it.

Subparagraphs a. and c. of this Exclusion do not apply to **PROPERTY DAMAGE** (other than damage by fire) to premises, including the contents of such premises, rented to **YOU** for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section V. Limits Of Insurance.

Subparagraph b. of this Exclusion does not apply if the premises are **YOUR WORK** and were never occupied, rented, or held for rental by **YOU**.

Subparagraphs c., d., e., and f. of this Exclusion do not apply to liability assumed under a sidetrack agreement.

Subparagraph f. of this Exclusion does not apply to **PROPERTY DAMAGE** included in the **PRODUCTS-COMPLETED OPERATIONS HAZARD**.

5. **Damage to Your Product**:

Any **PROPERTY DAMAGE** to **YOUR PRODUCT** arising out of it or any part of it.

6. **Damage to Your Work**:

Any **PROPERTY DAMAGE** to **YOUR WORK** arising out of it or any part of it and included in the **PRODUCTS-COMPLETED OPERATIONS HAZARD**.

This Exclusion does not apply if the damaged work or the work out of which the damage arises was performed on **YOUR** behalf by a subcontractor.

7. **Electronic Data**:

**BODILY INJURY**, **PROPERTY DAMAGE** or any loss, cost, or expense arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate **ELECTRONIC DATA**.

8. **Employer's Liability**:

**BODILY INJURY** to:

a. An **EMPLOYEE** of the **INSURED** arising out of and in the course of:

 (1) Employment by the **INSURED**; or

 (2) Performing duties related to the conduct of the **INSURED**'s business; or

b. The spouse, child, parent, or sibling of that **EMPLOYEE** as a consequence of Subparagraph a. above.

This Exclusion applies whether the **INSURED** may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This Exclusion does not apply to liability assumed by the **INSURED** under an **INSURED CONTRACT**.

9. **Expected or Intended Injury**:

**BODILY INJURY** or **PROPERTY DAMAGE** expected or intended from the standpoint of the **INSURED**.

This Exclusion does not apply to **BODILY INJURY** or **PROPERTY DAMAGE** resulting from the use of reasonable force to protect persons or tangible property.

10. **Liquor Liability**:

**BODILY INJURY** or **PROPERTY DAMAGE** for which any **INSURED** may be held liable by reason of:

a. Causing or contributing to the intoxication of any person;

b. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

c. Any statute, ordinance, or regulation relating to the sale, gift, distribution, or use of alcoholic beverages.

This Exclusion applies only if **YOU** are in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages.

11. **Mobile Equipment**:

Any BODILY INJURY or PROPERTY DAMAGE arising out of:

a. The transportation of MOBILE EQUIPMENT by an AUTO owned or operated by or rented or loaned to any INSURED; or

b. The use of MOBILE EQUIPMENT in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunt activity.

12. **Personal and Advertising Injury**:

BODILY INJURY arising out of PERSONAL AND ADVERTISING INJURY.

13. **Pollution**:

a. BODILY INJURY or PROPERTY DAMAGE arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of POLLUTANTS:

(1) At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any INSURED. However, this Subparagraph (1) does not apply to:

(i) BODILY INJURY if sustained within a building and because of smoke, fumes, vapor, or soot produced by or originating from equipment that is used to heat, cool, or dehumidify the building or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) BODILY INJURY or PROPERTY DAMAGE for which YOU may be held liable, if YOU are a contractor and the owner or lessee of such premises, site, or location has been added to YOUR policy as an Additional Insured with respect to YOUR ongoing operations performed for that Additional Insured at that premises, site, or location; and such premises, site, or location is not and never was owned or occupied by, or rented or loaned to, any INSURED, other than that Additional Insured;

(iii) BODILY INJURY or PROPERTY DAMAGE arising out of heat, smoke, or fumes from a HOSTILE FIRE; or

(iv) BODILY INJURY or PROPERTY DAMAGE arising out of an ELIGIBLE POLLUTION INCIDENT;

(2) At or from any premises, site, or location which is or was at any time used by or for any INSURED or others for the handling, storage, disposal, processing, or treatment of WASTE;

(3) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as WASTE by or for:

(i) Any INSURED; or

(ii) Any person or organization for whom YOU may be legally responsible;

(4) At or from any premises, site, or location on which any INSURED or any contractors or subcontractors working directly or indirectly on any INSURED's behalf are performing operations if the POLLUTANTS are brought on or to the premises, site, or location in connection with such operations by such INSURED, contractor, or subcontractor. However, this Subparagraph (4) does not apply to:

(i) BODILY INJURY or PROPERTY DAMAGE arising out of the escape of fuels, lubricants, or other operating fluids which are needed to perform the normal electrical, hydraulic, or mechanical functions necessary for the operation of MOBILE EQUIPMENT or its parts, if such fuels, lubricants, or other operating fluids escape from a vehicle part designed to hold, store, or receive them.

This exception, does not apply if the BODILY INJURY or PROPERTY DAMAGE arises out of the intentional discharge, dispersal, or release of the fuels, lubricants, or other operating fluids, or if such fuels, lubricants, or other operating fluids are brought on or to the premises, site, or location with the intent that they be discharged, dispersed, or released as part of the operations being performed by such INSURED, contractor, or subcontractor;

(ii) BODILY INJURY or PROPERTY DAMAGE sustained within a building and caused by the release of gases, fumes, or vapors from materials brought into that building in connection with operations being performed by YOU or on YOUR behalf by a contractor or subcontractor;

Includes copyrighted material of Insurance Services Office, Inc., with its permission. © Berkley Oil & Gas Specialty Services, LLC, 2010

(iii)  BODILY INJURY or PROPERTY DAMAGE arising out of heat, smoke, or fumes from a HOSTILE FIRE; or

(iv)  BODILY INJURY or PROPERTY DAMAGE arising out of an ELIGIBLE POLLUTION INCIDENT;

(5)  At or from any premises, site, or location on which any INSURED or any contractors or subcontractors working directly or indirectly on any INSURED's behalf are performing operations if the operations are to identify, abate, test for, sample, monitor, clean up, remove, cover, contain, treat, detoxify, decontaminate, neutralize, or mitigate, or in any way respond to or assess the effects of POLLUTANTS; or

(6)  At or from any UNDERGROUND STORAGE TANK.

b.  Any loss, cost, or expense arising out of any:

(1)  Request, demand, order, or statutory or regulatory requirement that any INSURED or others to identify, abate, test for, sample, monitor, clean up, remove, cover contain, treat, detoxify, decontaminate, neutralize, mitigate, or in any way respond to or assess the effects of POLLUTANTS; or

(2)  CLAIM, SUIT, or proceeding by or on behalf of a governmental authority for damages because of identification of, testing for, sampling, monitoring, cleaning up, removing, covering, containing, treating, detoxifying, decontaminating, neutralizing, mitigating, or in any way responding to or assessing the effects of POLLUTANTS.

However, this Subparagraph (b) does not apply to liability for damages because of PROPERTY DAMAGE that the INSURED would have in the absence of such request, demand, order, or statutory or regulatory requirement, or such CLAIM or SUIT by or on behalf of a governmental authority.

Exclusions in Paragraphs 1., 3., thru 6., 8., 10., 11., and 13. above do not apply to damage by fire to premises while rented to YOU or temporarily occupied by YOU with permission of the owner.  A separate limit of insurance applies to this coverage as described in Section V. Limits Of Insurance as shown on the Declarations Page.

### C.  Pollution Clean Up Costs Exclusions

In addition to those Exclusions listed above in Section VII.A., the following Exclusions apply to Section II. B. Pollution Clean Up Costs;

This policy does not apply to:

### 1.  Aircraft, Auto, or Watercraft:

POLLUTION CLEAN UP COSTS arising out of the ownership, maintenance, use, or entrustment to others of any Aircraft, AUTO, or Watercraft owned or operated by, rented by, chartered by, or loaned to any INSURED.  As respects this Exclusion, use includes operation and LOADING OR UNLOADING.

### 2.  Failure to Comply with Laws:

POLLUTION CLEAN UP COSTS arising out of or resulting from any failure to comply with any law, statute, regulation, ordinance, governmental directive, or order; provided that such failure is a willful or deliberate act or omission by or on behalf of the INSURED.

### 3.  Waste:

POLLUTION CLEAN UP COSTS arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of POLLUTANTS which are or were at any time transported, handled, stored, treated, disposed of, or processed as WASTE.

### 4.  Waste Site, Abandoned Premises, or Underground Storage Tanks:

POLLUTION CLEAN UP COSTS arising out of or in any way related to any actual, alleged, or threatened POLLUTION INCIDENT at, from, or related to any:

a.  WASTE SITE;

b.  Premises, site, or location any INSURED has sold, given away, or abandoned; or

c.  UNDERGROUND STORAGE TANKS.

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

D. **Personal and Advertising Injury Liability Exclusions**

In addition to those Exclusions listed above in Section VII.A., the following Exclusions apply to Section II.C. Personal and Advertising Injury Liability;

This policy does not apply to:

1. **Breach of Contract**:

   PERSONAL AND ADVERTISING INJURY arising out of a Breach of Contract, except an implied contract to use another's advertising idea in YOUR ADVERTISEMENT.

2. **Contractual Liability**:

   PERSONAL AND ADVERTISING INJURY for which the INSURED has assumed liability in a contract or agreement. This Exclusion does not apply to liability for damages that the INSURED would have in the absence of the contract or agreement.

3. **Criminal Acts**:

   PERSONAL AND ADVERTISING INJURY arising out of any Criminal Act or fraudulent conduct committed by, with the consent or knowledge of, or at the direction of the INSURED.

4. **Electronic Chatrooms or Bulletin Boards**:

   PERSONAL AND ADVERTISING INJURY arising out of an Electronic Chatroom or Bulletin Board the INSURED hosts, owns, or over which the INSURED exercises control.

5. **Infringement of Copyright, Patent, Trademark, or Trade Secret**:

   PERSONAL AND ADVERTISING INJURY arising out of the Infringement of Copyright, Patent, Trademark, Trade Secret, or other intellectual property rights. Under this Exclusion, such other intellectual property rights do not include the use of another's advertising idea in YOUR ADVERTISEMENT.

   However, this Exclusion does not apply to infringement, in YOUR ADVERTISEMENT, of copyright, trade dress, or slogan.

6. **Insureds in Media and Internet Type Businesses**:

   a. PERSONAL AND ADVERTISING INJURY committed by an INSURED whose business is:

      (1) Advertising, broadcasting, webcasting, publishing, or telecasting;

      (2) Designing or determining content of websites for others; or

      (3) An Internet search, access, content, or service provider.

   b. PERSONAL AND ADVERTISING INJURY arising out of:

      (1) Controlling, creating, designing, or developing of another's Internet site;

      (2) Controlling, creating, designing, developing, determining, or providing the content or material of another's Internet site;

      (3) Controlling, facilitating or providing, or failing to control, facilitate or provide, access to the Internet, or another's Internet site; or

      (4) Publication of content or material on or from the Internet, other than material developed by YOU or at YOUR location.

   However, this Exclusion does not apply to Paragraphs a., b., and c. of the definition of PERSONAL AND ADVERTISING INJURY. For the purposes of this Exclusion, the placing of frames, borders, links, or advertising, for YOU or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing, or telecasting.

7. **Knowing Violation of Rights of Another**:

   PERSONAL AND ADVERTISING INJURY caused by or at the direction of the INSURED with the knowledge that the act would violate the rights of another and would inflict PERSONAL AND ADVERTISING INJURY.

Includes copyrighted material of Insurance Services Office, Inc., with its permission. © Berkley Oil & Gas Specialty Services, LLC, 2010

**8. Material Published with Knowledge of Falsity:**

PERSONAL AND ADVERTISING INJURY arising out of oral or written publication of material, if done by or at the direction of the INSURED with knowledge of its falsity.

**9. Material Published Prior to Policy Period:**

PERSONAL AND ADVERTISING INJURY arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**10. Pollution:**

PERSONAL AND ADVERTISING INJURY arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of POLLUTANTS at any time.

**11. Pollution-Related:**

Any loss, cost, or expense arising out of any:

a. Request, demand, order, or statutory or regulatory raquirement that any INSURED or others identify, abate, test for, sample, monitor, clean up, remove, cover, contain, treat, detoxify, neutralize, mitigate, or in any way respond to, or assess the effects of POLLUTANTS; or

b. CLAIM, SUIT, or proceeding by or on behalf of a governmental authority for damages because of identifying, abating, testing for, sampling, monitoring, cleaning up, removing, covering, containing, treating, detoxifying, neutralizing, mitigating, or in any way responding to or assessing the effects of POLLUTANTS.

**12. Quality or Performance of Goods – Failure to Conform to Statements:**

PERSONAL AND ADVERTISING INJURY arising out of the failure of goods, products, or services to conform with any statement of quality or performance made in YOUR ADVERTISEMENT.

**13. Unauthorized Use of Another's Name or Product:**

PERSONAL AND ADVERTISING INJURY arising out of the Unauthorized Use of Another's Name or Product in YOUR e-mail address, domain name, METATAG, or any other similar tactics to mislead another's potential customers.

**14. Wrong Description of Prices:**

PERSONAL AND ADVERTISING INJURY arising out of the wrong description of the price of goods, products, or services stated in YOUR ADVERTISEMENT.

**E. Medical Payments Exclusions**

The following Exclusions apply to Section II.D. Medical Payments;

WE will not pay medical expenses for BODILY INJURY:

**1. Any Insured:**

To any INSURED, except VOLUNTEER WORKERS.

**2. Athletic Activities:**

To a person injured while practicing, instructing, or participating in any physical exercises, games, sports, or athletic contests.

**3. Bodily Injury and Property Damage Coverage Exclusions:**

Excluded under Section II. A. Bodily Injury and Property Damage Liability.

**4. Hired Person:**

To a person hired to do work for or on behalf of any INSURED or a tenant of any INSURED.

**5. Injury on Normally Occupied Premises:**

To a person injured on that part of premises YOU own or rent that the person normally occupies.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

6. **Products-Completed Operations Hazard**:

   Included within the **PRODUCTS-COMPLETED OPERATIONS HAZARD**.

7. **Workers' Compensation or Similar Laws**;

   To a person, whether or not an **EMPLOYEE** of any **INSURED**, if benefits for the **BODILY INJURY** are payable or must be provided under a Workers' Compensation or disability benefits law or a similar law.

## VIII. GENERAL CONDITIONS

A. **Bankruptcy**

Bankruptcy or insolvency of the **INSURED** or of the **INSURED**'s estate will not relieve **US** of **OUR** obligations under this policy.

B. **Cancellation**

1. The first **NAMED INSURED** shown on the Declarations Page may cancel this policy by mailing or delivering to **US** advance written notice of Cancellation.

2. **WE** may cancel this policy by mailing or delivering to the first **NAMED INSURED** written notice of Cancellation at least:

   a. 10 days before the effective date of Cancellation if **WE** cancel for nonpayment of premium; or

   b. 60 days before the effective date of Cancellation if **WE** cancel for any other reason.

3. **WE** will mail or deliver **OUR** notice to the first **NAMED INSURED**'s last mailing address known to **US**.

4. Notice of Cancellation will state the effective date of Cancellation. The policy period will end on that date.

5. If this policy is cancelled, **WE** will send the first **NAMED INSURED** any premium refund due. If **WE** cancel, the refund will be pro rata. If the first **NAMED INSURED** cancels, the refund may be less than pro rata. The Cancellation will be effective even if **WE** have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

C. **Changes**

This policy contains all the agreements between **YOU** and **US** concerning the insurance afforded. The first **NAMED INSURED** shown on the Declarations Page is authorized to make Changes in the terms of this policy with **OUR** consent. This policy's terms can be amended or waived only by endorsement issued by **US** and made a part of this policy.

D. **Duties in the Event of Occurrence, Offense, Claim, or Suit**

1. **YOU** must see to it that **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** is notified as soon as practicable of any **OCCURRENCE** or any offense which may result in a **CLAIM**. To the extent possible, notice should include:

   a. How, when, and where the **OCCURRENCE** or offense took place;

   b. The names and addresses of any injured persons and witnesses; and

   c. The nature and location of any injury or damage arising out of the **OCCURRENCE** or offense.

2. If a **CLAIM** is made or **SUIT** is brought against any **INSURED**, **YOU** must:

   a. Immediately record the specifics of the **CLAIM** or **SUIT** and the date received; and

   b. Notify **US** and see to it that **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** receives written notice of the **CLAIM** or **SUIT** as soon as practicable.

3. **YOU** and any other involved **INSURED** must:

   a. Immediately send **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** copies of any demands, notices, summonses, or legal papers received in connection with the **CLAIM** or **SUIT**;

   b. Authorize **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** to obtain records and other information;

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

    c. Cooperate with **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** in the investigation or settlement of the **CLAIM** or defense against the **SUIT**; and

    d. Assist **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** upon request, in the enforcement of any right against any person or organization which may be liable to the **INSURED** because of injury or damage to which this policy may also apply.

4. No **INSURED** will, except at that **INSURED**'s own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without consent of **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC**.

5. If a **CONTROL OF WELL INCIDENT** occurs, **YOU** agree, at **YOUR** own cost or expense, subject to Section VI, Supplementary Payments, A.3, Control of Well Expenses, to promptly and diligently take any steps legally required or necessary to engage in **CONTROL OF WELL ACTIVITIES** to remedy the problem.

In the event of a **CLAIM** call 1.877.515.CLMS (1.877.515.2567).

E. **Duties in the Event of a Pollution Incident**

1. **YOU** must take reasonable steps to mitigate the damage because of the **POLLUTANTS** and commence the clean up of **POLLUTANTS**.

2. **YOU** must notify **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** as soon as practicable, but no later than 90 days (or 120 days, if **YOU** are a **NON-OPERATING WORKING INTEREST** owner) of when any **INSURED, AGENT, OPERATOR,** or **OIL OR GAS SITE CONTRACTOR** first gained knowledge of the **POLLUTION INCIDENT**. The notice should include:

    a. How, when, and where the **POLLUTION INCIDENT** took place; and

    b. The nature and location of any injury or damage arising out of the **POLLUTION INCIDENT**.

3. If a **CLAIM** is made or **SUIT** is brought against any **INSURED** arising out of a **POLLUTION INCIDENT, YOU** must:

    a. Immediately record the specifics of the **CLAIM** or **SUIT** and the date received; and

    b. Notify **US** and see to it that **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** receives written notice of the **CLAIM** or **SUIT** as soon as practicable.

4. **YOU** and any other involved **INSURED** must:

    a. Immediately send **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** copies of any demands, notices, summonses, or legal papers received in connection with the **CLAIM** or **SUIT**;

    b. Authorize **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** to obtain records and other information;

    c. Cooperate with **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** in the investigation or settlement of the **CLAIM** or defense against the **SUIT**; and

    d. Assist **BERKLEY OIL & GAS SPECIALTY SERVICES, LLC** upon request, in the enforcement of any right against any person or organization which may be liable to the **INSURED** because of **POLLUTION CLEAN UP COSTS**, injury or damage to which this policy may also apply.

In the event of a **POLLUTION INCIDENT** call 1.877.515.CLMS (1.877.515.2567).

F. **Examination of Your Books and Records**

**WE** may examine and audit **YOUR** books and records as they relate to this policy at any time during the policy period and up to three years afterward.

G. **Independent Counsel**

In the event **YOU** are entitled by law to select Independent Counsel to defend **YOU** at **OUR** expense, the attorney fees and all other litigation expenses **WE** must pay to that counsel are limited to the rates **WE** actually pay to counsel **WE** retain in the ordinary course of **OUR** business in the defense of **CLAIMS** or **SUITS** in the community where the **CLAIM** or **SUIT** is being defended. Additionally, **WE** may exercise the right to require that such counsel have certain minimum qualifications with respect to their competency including experience in defending **CLAIMS** or **SUITS** similar to the one against **YOU**, and to require such counsel to have malpractice insurance coverage. As respects any such counsel, **YOU** agree that **YOU** and that counsel will respond timely to **OUR** request for information regarding the **CLAIM** or **SUIT** to the extent allowable by law. Furthermore, the **INSURED** may at anytime, by its signed consent, freely and fully waive its right to select Independent Counsel.

Section VIII. General Conditions

**H. Inspections and Surveys**

1. WE have the right to:

   a. Make Inspections and Surveys at any time;

   b. Give YOU reports on the conditions WE find; and

   c. Recommend changes.

2. WE are not obligated to make any inspections, surveys, reports, or recommendations, and any such actions WE do undertake relate only to insurability and the premiums to be charged. WE do not make safety inspections. WE do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. In addition, WE do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes, or standards.

3. Paragraphs 1. and 2. of this condition apply not only to US, but also to any rating, advisory, rate service, or similar organization which makes insurance inspections, surveys, reports, or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports, or recommendations WE may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels, or elevators.

**I. Legal Action Against Us**

No person or organization has a right under this policy;

1. To join US as a party or otherwise bring US into a SUIT asking for damages or POLLUTION CLEAN UP COSTS from an INSURED; or

2. To sue US on this policy unless all of its terms have been fully complied with.

A person or organization may sue US to recover on an AGREED SETTLEMENT or on a final judgment against an INSURED; but WE will not be liable for damages or POLLUTION CLEAN UP COSTS that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance.

**J. Nonrenewal**

If WE decide not to renew this policy, WE will mail or deliver to the first NAMED INSURED shown on the Declarations Page written notice of the Nonrenewal not less than 60 days before the expiration date. If notice is mailed, proof of mailing will be sufficient proof of notice.

**K. Other Insurance**

If other valid and collectible insurance is available to the INSURED for a loss WE cover under Section II.A. Bodily Injury and Property Damage Liability, Section II.B. Pollution Clean Up Costs, or Section II.C. Personal and Advertising Injury Liability of this policy, OUR obligations are limited as follows:

1. **Primary Insurance:**

   This policy is primary except when Paragraph 2. Excess Insurance below applies. If this policy is primary, OUR obligations are not affected unless any of the Other Insurance is also primary. Then, WE will share with all other policies by the method described in Paragraph 3. Method of Sharing below.

2. **Excess Insurance:**

   a. This policy is excess over:

      (1) **Any Other Insurance:**

         Any of the Other Insurance, whether primary, excess, contingent, or on any other basis:

         (a) **Your Work:**

            That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for YOUR WORK;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

Section VIII. General Conditions

(b) **Fire:**

That is Fire insurance for premises rented to YOU or temporarily occupied by YOU with permission of the owner;

(c) **Tenant:**

That is insurance purchased by YOU to cover YOUR liability as a Tenant for **PROPERTY DAMAGE** to premises rented to YOU or temporarily occupied by YOU with permission of the owner;

(d) **Aircraft, Auto, or Watercraft:**

If the loss arises out of the ownership, maintenance or use of any Aircraft, **AUTO**, or Watercraft to the extent not subject to Section VII.B.1. and Section VII.C.1. Aircraft, Auto, or Watercraft Exclusions;

(e) **Non-operating Working Interest:**

That is available to any person or organization owning a **NON-OPERATING WORKING INTEREST**. However, this policy will be primary and **NON-CONTRIBUTORY** if YOU and the **NON-OPERATING WORKING INTEREST** owner have agreed prior to loss, in a written contract or written agreement, in effect during the policy period, that this policy will be primary and **NON-CONTRIBUTORY**;

(f) **Operators Extra Expense/Control of Well:**

That is Operators Extra Expense, Control of Well, or similar insurance;

(g) **Pollution:**

That is Pollution liability insurance or any other insurance to cover a **POLLUTION INCIDENT**;

(h) **Additional Insured:**

That is available to any person or organization that is an Additional Insured. However, with respect to the person or organization made an Additional Insured for liability arising out of **YOUR** operations, or liability arising out of premises owned by or rented to **YOU**, this policy will be primary and **NON-CONTRIBUTORY** if **YOU** and the Additional Insured have agreed prior to loss, in a written contract or written agreement, in effect during the policy period, that this policy will be primary and **NON-CONTRIBUTORY.**

(2) **Any Other Primary Insurance**

Any Other Primary Insurance available to YOU covering liability for damages or **POLLUTION CLEAN UP COSTS** arising out of the premises or operations, or the products and completed operations, for which YOU have been added as an Additional Insured.

b.  When this insurance is excess, WE will have no duty under Section II.E. Duty to Defend to defend the **INSURED** against any **SUIT** if any other insurer has a Duty to Defend the **INSURED** against that **SUIT**. If no other insurer defends, WE will undertake to do so, but WE will be entitled to the **INSURED's** rights against all those other insurers.

c.  When this policy is excess over Other Insurance, WE will pay only OUR share of the amount of the loss, if any, that exceeds the sum of:

(1)  The total amount that all such Other Insurance would pay for the loss in the absence of this policy; and

(2)  The total of all deductible and self-insured amounts under all that Other Insurance.

d.  WE will share the remaining loss, if any, with any Other Insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits Of Insurance shown on the Declarations Page of this policy.

3.  **Method of Sharing**

If all of the Other Insurance permits contribution by equal shares, WE will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the Other Insurance does not permit contribution by equal shares, WE will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

*Includes copyrighted material of Insurance Services Office, Inc., with its permission.*
© Berkley Oil & Gas Specialty Services, LLC, 2010

### L. Premiums

The first NAMED INSURED shown on the Declarations Page:

1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums WE pay.

### M. Premium Audit

1. WE will compute all premiums for this policy in accordance with OUR rules and rates.
2. Premium shown in this policy as estimated premium is a deposit premium only. At the close of each audit period, WE will compute the earned premium for that period and send notice to the first NAMED INSURED. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the deposit and audit premiums paid for the policy period is greater than the earned premium, WE will return the excess to the first NAMED INSURED.
3. The first NAMED INSURED must keep records of the information WE need for premium computation, and send US copies at such times as WE may request.

### N. Representations

By accepting this policy, YOU agree that:

1. The statements on the Declarations Page are accurate and complete;
2. Those statements are based upon representations YOU made to US;
3. WE have issued this policy in reliance upon YOUR representations; and
4. YOUR failure to disclose all hazards or prior OCCURRENCES, POLLUTION INCIDENTS, or offenses existing as of the inception date of this policy shall not prejudice the coverage afforded by this policy, provided such failure to disclose all hazards, prior OCCURRENCES, POLLUTION INCIDENTS, or offenses is not intentional or willful.

### O. Separation of Insureds

Except with respect to the Limits Of Insurance, and any rights or duties specifically assigned in this policy to the first NAMED INSURED, this policy applies:

1. As if each NAMED INSURED were the only NAMED INSURED; and
2. Separately to each INSURED against whom CLAIM is made or SUIT is brought.

### P. Transfer of Rights of Recovery Against Others to Us and Waiver of Subrogation

If the INSURED has rights to recover all or part of any payment WE have made under this policy, those rights are transferred to US. The INSURED must do nothing, after the OCCURRENCE, POLLUTION INCIDENT, or offense, to impair them. At OUR request, the INSURED will bring SUIT or transfer those rights to US and help US enforce them.

However, WE agree to waive OUR right of recovery against any person or organization with whom YOU have agreed, by written contract or written agreement in effect during the policy period and executed before the OCCURRENCE, POLLUTION INCIDENT, or offense, to waive those rights of recovery.

### Q. Use of Titles

The titles to the various sections, subsections, paragraphs, subparagraphs, and endorsements of this policy are intended solely for ease of reference and do not in any way limit, expand, or otherwise affect the provisions of such sections, subsections, paragraphs, subparagraphs, and endorsements.

Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

## IX. DEFINITIONS

ACID RAIN means rain containing high concentrations of acids, including, but not limited to, sulfur dioxide and nitrogen oxides.

ADVERTISEMENT means a notice that is broadcast or published to the general public or specific market segments about YOUR goods, products, or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding websites, only that part of a website that is about YOUR goods, products, or services for the purposes of attracting customers or supporters is considered an ADVERTISEMENT.

AGENT means a person or persons authorized by YOU to act on YOUR behalf in relation to YOUR oil, gas, or other mineral properties.

AGREED SETTLEMENT means a settlement and release of liability signed by US, the INSURED and the claimant or the claimant's LEGAL REPRESENTATIVE.

ASBESTOS means ASBESTOS in any form, including, but not limited to, asbestos-containing products, asbestos fibers, and asbestos dust, and including its presence or use in any alloy, by-product, or other material or WASTE.

AUTO means:

a. A land motor vehicle, trailer, or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, AUTO does not include MOBILE EQUIPMENT.

BERKLEY OIL & GAS SPECIALTY SERVICES, LLC means the entity that performs underwriting and claims services for this policy.

BODILY INJURY means physical injury, sickness, or disease sustained by a person, including death, resulting from any of these at any time. BODILY INJURY includes mental anguish or other mental injury to that person sustaining physical injury.

CAPITAL EXPENDITURE means either money voluntarily spent or a charge voluntarily incurred for additions, improvements, or betterments to equipment or real property. CAPITAL EXPENDITURE includes, but is not limited to, money spent or a charge incurred for tha purpose of complying with any order or

request of any regulatory agency that is intended, in whole or in part, to prevent or mitigate future POLLUTION INCIDENTS.

CLAIM means a request or demand received by YOU for monetary damages or POLLUTION CLEAN UP COSTS.

CONTROL OF WELL ACTIVITIES means:

a. Controlling or bringing under control;

b. Drilling of any relief, replacement, or substitute well or hole for; or

c. Extinguishing a fire in, at, or from;

any oil, gas, mineral, geothermal, or water well(s) and/or hole where a CONTROL OF WELL INCIDENT has taken place.

CONTROL OF WELL EXPENSES means costs or expenses of controlling or bringing under control any oil, gas, mineral, geothermal, or water well(s) and/or hole, up to and including, without limitation:

a. Expenses incurred in extinguishing fire in or from such well(s); and

b. Costs and expenses incurred in drilling relief oil, gas, mineral, geothermal, or water well(s);

and/or hole(s) whether or not such relief well(s) or hole(s) is successful.

CONTROL OF WELL INCIDENT means an unintended flow of drilling fluid, oil, gas, or water from any oil, gas, mineral, geothermal, or water well(s) and /or hole, and cannot be controlled by a blowout preventer, storm chokes, other equipment, or control measures.

ELECTRONIC DATA means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or any other media which are used with electronically controlled equipment.

ELIGIBLE POLLUTION INCIDENT means any POLLUTION INCIDENT that meets the following requirements:

a. The POLLUTION INCIDENT is both unexpected and unintended from the standpoint of the INSURED;

b. The POLLUTION INCIDENT commenced abruptly and instantaneously and can be clearly identified as having commenced entirely at a specific time on a specific date during the policy period;

c. The POLLUTION INCIDENT was known by any INSURED, AGENT, OPERATOR, or OIL OR GAS SITE CONTRACTOR within 30 days of the commencement of the POLLUTION INCIDENT; and

Includes copyrighted material of Insurance Services Office, Inc., with its permission. © Berkley Oil & Gas Specialty Services, LLC, 2010

Section IX. Definitions

d. The POLLUTION INCIDENT was reported to BERKLEY OIL & GAS SPECIALTY SERVICES, LLC as soon as practicable but no later than 90 days from the date of knowledge of the commencement of the POLLUTION INCIDENT. However, if YOU own a NON-OPERATING WORKING INTEREST in an OIL OR GAS SITE that has a POLLUTION INCIDENT, YOU must report to BERKLEY OIL & GAS SPECIALTY SERVICES, LLC as soon as practicable but no later than 120 days from the date of knowledge of the commencement of the POLLUTION INCIDENT.

EMPLOYEE includes a LEASED WORKER. EMPLOYEE does not include a TEMPORARY WORKER.

EXECUTIVE OFFICER means a person holding any of the officer positions created by YOUR charter, constitution, by-laws, or any other similar governing document.

FUNGI means any type or form of fungus, including mold or mildew or any mycotoxins, spores, scents, or byproducts produced or released by FUNGI.

GOVERNMENT IDENTIFIED CONTAMINATED SITE means any premises, site, or location that has been placed on, proposed for placement, or otherwise identified with the National Priorities List of the Comprehensive Environmental Response, Compensation, and Liability Act; Superfund Amendments and Reauthorization Act, or any other similar state or national governmental authority's legislation creating a priority list for the clean up of POLLUTANTS.

HOSTILE FIRE means one which becomes uncontrollable or breaks out from where it was intended to be.

IMPAIRED PROPERTY means tangible property, other than YOUR PRODUCT or YOUR WORK, that cannot be used or is less useful because:

a. It incorporates YOUR PRODUCT or YOUR WORK, that is known or thought to be defective, deficient, inadequate, or dangerous; or

b. YOU have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment, or removal of YOUR PRODUCT or YOUR WORK, or YOUR fulfilling the terms of the contract or agreement.

INDEMNITEE means a person or organization that YOU have agreed under a written contract or written agreement to indemnify or hold harmless.

INSURED means a person or organization qualifying as an INSURED in Section I. Named Insureds And Insureds.

INSURED CONTRACT means:

a. That part of any written contract or agreement pertaining to YOUR business including, but not limited to, an indemnification required by:

(1) A master service agreement;
(2) Drilling contract;
(3) Rental agreement; or
(4) Any other oilfield contract;

under which YOU assume the liability of another party to pay for BODILY INJURY or PROPERTY DAMAGE to a third person or organization. Paragraph a. does not include that part of any contract or agreement:

(1) That indemnifies an architect, engineer, or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(2) Under which the INSURED, if an architect, engineer, or surveyor, assumes liability for an injury or damage arising out of the INSURED's rendering or failure to render PROFESSIONAL SERVICES, including those listed in (1)(b) above and supervisory, inspection, architectural, or engineering activities.

b. That part of any written contract or agreement, such as a Joint Operating Agreement, that requires the INSURED to share in the payment of expenses resulting from BODILY INJURY or PROPERTY DAMAGE because of an OCCURRENCE during this policy period based upon the INSURED's obligation to pay a percentage of expenses. However, the obligation to pay expenses will be limited to the INSURED's ownership interest.

c. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to YOU or temporarily occupied by YOU with permission of the owner is not an INSURED CONTRACT;

d. A sidetrack agreement;

e. An easement or license agreement;

f. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or

g. An elevator maintenance agreement.

LEAD means LEAD in any form, including, but not limited to, lead-containing products, and lead dust, and including its presence or use in any product, alloy, by-product, or other material or WASTE.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

**LEASED WORKER** means a person leased to **YOU** by a labor leasing firm under a written agreement between **YOU** and the labor leasing firm, to perform duties related to the conduct of **YOUR** business. **LEASED WORKER** does not include a **TEMPORARY WORKER**.

**LEGAL REPRESENTATIVE** means any person, executor, or trustee appointed by **YOU**, or by operation of law or a court, to act on **YOUR** behalf after **YOUR** death.

**LOADING OR UNLOADING** means the handling of property:

    **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, **AUTO**, or watercraft;

    **b.** While it is in or on an aircraft, **AUTO**, or watercraft; or

    **c.** While it is being moved from an aircraft, **AUTO**, or watercraft to the place where it is finally delivered;

but **LOADING OR UNLOADING** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, **AUTO**, or watercraft.

**MANAGERS** mean the individual or individuals designated in **YOUR** governing documents to act as **MANAGER**.

**MEMBERS** mean persons or entities designated in **YOUR** governing documents as **MEMBERS** or other such terminology that establishes ownership.

**METATAG** means hidden or embedded text or code that is not seen by persons viewing the website, but that operates to attract search engines to that site.

**MOBILE EQUIPMENT** means any of the following types of land vehicles, including any attached machinery or equipment:

    **a.** Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

    **b.** Vehicles maintained for use solely on or next to premises **YOU** own or rent;

    **c.** Vehicles that travel on crawler treads;

    **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        **(1)** Power cranes, shovels, loaders, diggers, or drills; or

        **(2)** Road construction or resurfacing equipment such as graders, scrapers, or rollers;

    **e.** Vehicles not described in Paragraph a., b., c., or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        **(1)** Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment; or

        **(2)** Cherry pickers and similar devices used to raise or lower workers;

    **f.** Vehicles not described in Paragraph a., b., c., or d. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not **MOBILE EQUIPMENT** but will be considered **AUTOS**:

    **(1)** Equipment designed primarily for:

        **(a)** Snow removal;

        **(b)** Road maintenance, but not construction or resurfacing; or

        **(c)** Street cleaning;

    **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **(3)** Air compressors, pumps, and generators including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment.

However, **MOBILE EQUIPMENT** does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered **AUTOS**.

**NAMED INSURED** means a person or organization qualifying as a **NAMED INSURED** in Section I.A. Named Insured(s) of this policy.

**NAMED STORM** means a storm system that has been declared a tropical storm or hurricane and assigned a name by the National Hurricane Center or the Central Pacific Hurricane Center of the National Weather Service (hereafter referred to as NHC and CPHC). For purposes of this policy, a **NAMED STORM** begins at the time a Watch or Warning is issued by the NHC or CPHC for the area in which the affected premises are located, and ends 72 hours after the termination of the last Watch or Warning issued for that area by the NHC or CPHC.

**NON-CONTRIBUTORY** means that other available insurance will apply as excess and will not contribute as primary to the insurance provided by this policy.

**NON-OPERATING WORKING INTEREST** means an interest in the ownership of and participation in the operating expenses of an oil, gas, or other mineral property, that is owned by a person or organization who is not designated as **OPERATOR** of that property and who is without operating rights of that property.

**NUCLEAR FACILITY** means any:

    **a.** **NUCLEAR REACTOR**;

    **b.** Equipment or device designed or used for separating the isotopes of plutonium or uranium; processing or utilizing **NUCLEAR SPENT FUEL**; or handling, processing or packaging **NUCLEAR WASTE**;

    **c.** Equipment or device used for the processing, fabricating, or alloying of **NUCLEAR MATERIAL**, if at any time the total amount of such material in the custody of the **INSURED** at the premises where such equipment or device is located consists of or contains more than twenty-five (25) grams of plutonium or uranium 233, or any combination thereof; or two hundred-fifty (250) grams of uranium 235; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© Berkley Oil & Gas Specialty Services, LLC, 2010

d. Structure, basin, excavation, premises, or place prepared or used for the storage or disposal of **NUCLEAR WASTE;**

And includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used such operations.

**NUCLEAR HAZARDOUS PROPERTIES** means radioactive, toxic, or explosive properties.

**NUCLEAR MATERIAL** means by-product material, source material, special **NUCLEAR MATERIAL,** or naturally occurring **RADIOACTIVE MATERIAL,** including, but not limited to, that naturally occurring **RADIOACTIVE MATERIAL** referred to as NORM or the technically enhanced naturally occurring **RADIOACTIVE MATERIAL** referred to as TNORM. By-product material, source material, or special **NUCLEAR MATERIAL** have the meaning given them in the United States of America Atomic Energy Act of 1954 or in any law amendatory thereof.

**NUCLEAR PROPERTY DAMAGE** includes all forms of radioactive contamination of property.

**NUCLEAR REACTOR** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**NUCLEAR SPENT FUEL** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **NUCLEAR REACTOR.**

**NUCLEAR WASTE** means any **WASTE** material containing **NUCLEAR MATERIAL,** other than tailings or **WASTES** produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content; and resulting from the operation by any person or organization of any **NUCLEAR FACILITY** described in Paragraphs a. and b. of the definition of **NUCLEAR FACILITY.**

**OCCURRENCE** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**OIL OR GAS SITE** means any site, location, or premises at which **YOU** or any person or organization acting on **YOUR** behalf is conducting oil, gas, or other mineral exploration or production activities. **OIL OR GAS SITE** does not include any location used for office or administrative purposes or storage or maintenance of any vehicles or equipment.

**OIL OR GAS SITE CONTRACTOR** means any person or entity that has been contracted by **YOU** or on **YOUR** behalf to operate, maintain, test, or gauge any well, tank, or other equipment related to any of **YOUR** oil, gas, or other mineral properties.

**OILFIELD SERVICES CONTRACTOR** means any person or entity that is primarily engaged in performing oil and gas field services for others on a contract or fee basis. Services included are: well surveying; running, cutting, and pulling casing tubes and rods; for cementing wells; shooting wells; perforating well casings; acidizing and chemically treating wells; cleaning out, bailing, and swabbing wells; fishing for tools; servicing wells; well logging; and testing.

**OPERATOR** means any person or entity that is designated to manage, control, and operate oil, gas, or other mineral properties.

**OUR** means the company listed on the Declarations Page of this policy that insures **YOU.**

**PERSONAL AND ADVERTISING INJURY** means injury, including consequential **BODILY INJURY,** arising out of one or more of the following offenses:
   a. False arrest, detention, or imprisonment;
   b. Malicious prosecution;
   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;
   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
   f. The use of another's advertising idea in **YOUR ADVERTISEMENT;** or
   g. Infringing upon another's copyright, trade dress, or slogan in **YOUR ADVERTISEMENT.**

**POLLUTANTS** mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and **WASTE.**

**POLLUTION CLEAN UP COSTS** means reasonable expenses incurred to investigate, quantify, monitor, abate, remove, dispose, treat, neutralize, or immobilize **POLLUTANTS.** Reasonable expenses shall not include:
   a. Any additional loss, cost, or expense incurred for the processing, reclamation, recovery, separation, or salvage of oil or gas in order to sell, distribute, use, or store the oil or gas; or
   b. Any loss, cost, or expense for the removal of wreckage or debris of **YOUR** oil or gas platform, arising from a **NAMED STORM.**

**POLLUTION INCIDENT** means the emission, discharge, dispersal, seepage, migration, release, or escape of **POLLUTANTS.**

*Includes copyrighted material of Insurance Services Office, Inc., with its permission.*
© Berkley Oil & Gas Specialty Services, LLC, 2010

PRODUCING WELL means an oil or gas well(s) and/or hole(s) that has been actively producing oil or gas as intended for use, sale, or distribution. PRODUCING WELL does include an oil or gas well(s) and/or hole(s) that has been temporarily shut in.

PRODUCTS-COMPLETED OPERATIONS HAZARD

a. Includes all BODILY INJURY and PROPERTY DAMAGE occurring away from premises YOU own or rent and arising out of YOUR PRODUCT or YOUR WORK except:
(1) Products that are still in YOUR physical possession; or
(2) Work that has not yet been completed or abandoned. However, YOUR WORK will be deemed completed at the earliest of the following times:
(a) When all of the work called for in YOUR contract has been completed;
(b) When all of the work to be done at the job site has been completed if YOUR contract calls for work at more than one job site; or
(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
b. Does not include BODILY INJURY or PROPERTY DAMAGE arising out of:
(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by YOU, and that condition was created by the LOADING OR UNLOADING of that vehicle by any INSURED;
(2) The existence of tools, uninstalled equipment, or abandoned or unused materials; or
(3) Products or operations for which the classification in OUR rules indicates that such products or completed operations are not subject to Products-Completed Operations Hazard Limit.

PROFESSIONAL SERVICES means technical or unique functions performed by persons or organizations whose occupation is the rendering of such services and for which such services are rendered pursuant to a license, certificate, or other credential issued by federal, state, or local governments. PROFESSIONAL SERVICES, include, but are not limited to: accounting; architecture; dentistry; engineering; funeral and embalming services; landscape architecture; land surveying; legal; medicine, including nursing and allied health professions; optometry; pharmacy; real estate; real estate appraising; preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; or supervisory or inspection activities performed as part of any related architectural or engineering activities.

PROPERTY DAMAGE means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the OCCURRENCE that caused it.

For the purposes of this policy, ELECTRONIC DATA is not tangible property.

RADIOACTIVE MATERIAL means any solid, liquid, or gaseous substance which emits radiation, including, but not limited to, naturally occurring RADIOACTIVE MATERIAL (NORM) or technically enhanced naturally occurring RADIOACTIVE MATERIAL (TNORM).

SILICA means silicon dioxide (occurring in crystalline, amorphous, and impure forms), silica particles, and silica dust, or silica compounds.

SILICA-RELATED DUST means a mixture or combination of SILICA and other dust or particles.

SUIT means a civil proceeding where BODILY INJURY, PROPERTY DAMAGE, POLLUTION CLEAN UP COSTS, or PERSONAL AND ADVERTISING INJURY to which this policy applies are alleged. SUIT includes:
a. An arbitration proceeding in which damages or POLLUTION CLEAN UP COSTS are claimed and to which the INSURED must submit or does submit with OUR consent; or
b. Any other alternative dispute resolution proceeding in which damages or POLLUTION CLEAN UP COSTS are claimed and to which the INSURED submits with OUR consent.

TEMPORARY WORKER means a person who is furnished to YOU to substitute for a permanent EMPLOYEE on leave or to meet seasonal or short-term workload conditions.

UNDERGROUND OILFIELD EQUIPMENT means any drill bit, tool, pump, or other drilling or well servicing machinery, or equipment located beneath the surface of the earth in any well or hole or beneath the surface of any body of water. UNDERGROUND OILFIELD EQUIPMENT is not equipment that is above ground such as a monkey board.

UNDERGROUND RESOURCES means oil, gas, water, or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water.